DENVER & R. G. R. Co. *v.* UNITED STATES, (two cases.)

*(Circuit Court, D. Colorado.* May 10, 1888.)

1. PUBLIC LANDS—LICENSE TO RAILROADS TO CUT TIMBER.
    Act Cong. June 8, 1872, (17 U. S. St. at Large, 339,) granted to the D. & R. G. R. Co. the right to take stone, timber, etc., from public lands for the construction and repair of its railway, provided it was completed within five years from its passage; and in case of default the act was to be null and void as to the unfinished portion of the road. This act was amended to change the five years to ten. By act Cong. March 3, 1875, a general grant to railroads was made, similar to the special grant of the act of 1872, except that it limited the right to material to that necessary for the construction alone. *Held,* that the D. & R. G. R. Co. was entitled to the privileges of both acts.

2. SAME—PLACE OF USE.
    Where a railroad has the right to take timber from the public lands adjacent to its right of way, to use for purposes of construction, it can take timber so obtained to any point of the line, however distant from the place of cutting.

3. SAME.
    For the rights granted under the general act of 1875, the portions of the D. & R. G. R. R. built before and after June 8, 1882, are to be treated as one road, and timber can be taken from the entire line for the construction of any portion of the line provided for in the original organization.

4. SAME—PURPOSES OF USE.
  Under these acts. section and depot houses, snow-sheds, and fences are a part of the railroad.
5. SAME—REPAIRS.
  Under these acts, no timber can be taken from the public lands for the repair of any portion of the D. & R. G. R. Co.'s track not completed before June 8, 1882, and for that portion only from the lands adjacent thereto.
6. SAME—ADDITIONS.
  After a railroad line is once completed it has no right under act Cong. March 3, 1875, to take timber from the public lands to build new switches and side tracks.

Error from district court, district of Colorado; HALLETT, Judge.

The United States, plaintiff, sued the Denver & Rio Grand Railroad Company and others, defendants, in two suits, for cutting timber illegally on the public lands. Judgments for plaintiff, and defendants bring error. Both suits were consolidated.

*Wolcott & Vaile,* for plaintiff in error.

*H. W. Hobson,* U. S. Atty., for defendant.

BREWER, C. J. These two cases come here on error from the district court, judgments having been rendered there in favor of the United States and against the plaintiff in error, for the full amounts claimed. Each case was tried on an agreed statement of facts. On June 8, 1872, congress passed an act making a grant to the Denver & Rio Grande Railway Company. 17 U. S. St. at Large, 339. The material portion of that grant is as follows:

"That the right of way over the public domain, one hundred feet in width on each side of the track, together with such public lands adjacent thereto as may be needed for depots. shops, and other buildings for railroad purposes, and for yard-room and side tracks, not exceeding twenty acres at any one station, and not more than one station in every ten miles, and the right to take from the public lands adjacent thereto stone, timber, earth, water, and other material required for the construction and repair of its railway and telegraph line, be, and the same are hereby, granted and confirmed unto the Denver & Rio Grande Railway Company, a corporation created under the incorporation laws of the territory of Colorado, its successors and assigns: * * * provided, that said company shall complete its railway to a point on the Rio Grande as far south as Santa Fe within five years of the passage of this act, and shall complete fifty miles additional south of said point in each year thereafter; and in default thereof the rights and privileges herein granted shall be rendered null and void so far as respects the unfinished portion of said road."

Subsequently this proviso was changed so as to give ten years instead of five. 19 U. S. St. at Large, 405. On March 3, 1875, congress passed an act, making a general grant "to any railroad company duly organized under the laws of any state or territory," etc., which grant, for all questions that arise in this case, is similar to the special grant to the Denver & Rio Grande, except that in the general grant the right to take material, earth, stone, and timber is limited to what may be necessary for the construction, and not, as in the special grant, for construction and repairs.

The agreed statement of facts in the first case is as follows: That it is agreed—*First.* That the timber sued for in said action was cut by

William A. Eckerly & Co., as agents for the Denver & Rio Grande Railway Company, and delivered to said railway company. *Second*. That the attached statement correctly shows the kind and amounts of timber so cut and delivered, and also shows the time of cutting, the purposes for which it was cut and used, and the prices paid for cutting and delivering the same. *Third*. That said timber was cut in Montrose county, Colo., and near the town of Montrose, and upon public, unoccupied, and unentered lands of the United States. *Fourth*. That the lands from which the timber was cut were along and near and adjacent to the line of railway of said company. *Fifth*. That the portion of the line of railway through said county of Montrose, and in the vicinity of said town of Montrose, was not constructed or completed until after June 8, 1882, and that on June 8, 1882, said line of railway was only constructed and completed as far westward of Cebolla, in Gunnison county, Colo. *Sixth*. That said company had not completed its line of railway to Santa Fe on June 8, 1882, nor has it ever so completed it. · *Seventh*. That of the timber cut as aforesaid a part was used on portions of the line of railway out to Grand Junction constructed and completed after June 8, 1882, and for the purpose of construction of railway, erection of section and depot houses, snow-sheds, fences, etc.; and a part was shipped by the Denver & Rio Grande Railway for similar purposes to the Denver & Rio Grande Western Railway, to be used in the territory of Utah, as shown in attached statement; and $1,000 worth was used for repairs on portions of road completed prior to June 8, 1882. *Eighth*. That as to all of its line of railway constructed after June 8, 1882, the said company strictly complied with all the requirements of the act of congress approved March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States." *Ninth*. That upon the foregoing agreed statement of facts the following questions are to be submitted to the court for decision: (*a*) Whether under the act of June 8, 1872, and an act of March 3, 1877, amendatory thereof, the Denver & Rio Grande Railway Company had a right to cut timber for any purposes on public land of the United States adjacent to portions of its line of railway constructed and completed after June 8, 1882. (*b*) What are "adjacent" lands within the meaning of the act of congress, approved June 8, 1872, entitled "An act granting the right of way through the public lands to the Denver & Rio Grande Railway Company," and the act of congress of March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States?" (*c*) Whether under said acts said company could cut timber on public lands of the United States adjacent to the portions of the line of railway completed subsequently to June 8, 1882, to be used for purposes of repair, and for station and section houses, and for fences and snow-sheds on those portions of said railway line constructed and completed prior to June 8, 1882. (*d*) Whether under such statutes said railway company could cut timber from public lands adjacent to portions of the line of railway completed after June 8, 1882, to be used for any purposes on portions of the line of railway constructed and completed after June 8, 1882, and, if so, for

what purposes. (*e*) Whether the terms of the statute giving said railway company the right to take timber "for the construction and repair of its railway lines" would in anywise comprise and comprehend the erection, building, and repair of section and depot houses, snow-sheds, fences, and rolling stock. (*f*) Had the said railway company the right, under the act of March 3, 1875, to take from adjacent public lands material, earth, stone, and timber necessary for the construction of its railroad? (*g*) To what extent, and for what amount, the Denver & Rio Grande Railway Company is responsible for timber cut as aforesaid, and shipped to Utah for use on the Denver & Rio Grande Western Railway. (*h*) To what extent, and for what amount, said railway company is liable, if at all, upon the above agreed statement of facts, and upon the law as it shall be decided by the court. *Tenth.* That this case is a test case to obtain a definite and positive adjudication by a court of competent jurisdiction of the various points set out above, and of the rights of said railway company with regard to cutting timber from public lands under the act of June 8, 1872, under the amendatory act of March 3, 1877, and under the act of March 3, 1875. *Eleventh.* That judgment shall be entered by the court upon the foregoing statement of facts, and upon the law as it shall decide it, and at a valuation for said timber as set out in the annexed statement. *Twelfth.* That the admissions made in this statement of facts shall bind the parties hereto only for this suit, and shall not bind them as to any other matter or case.

There is some dispute between counsel as to the questions that are involved in and presented by these facts. I shall not attempt to consider any that I do not think are fairly and clearly presented by the facts. The fourth paragraph stipulates that the lands from which the timber was cut were adjacent to the line of railway; hence I shall not stop to consider how near land must be to be adjacent,—whether half a mile or ten miles. I certainly do not agree with the idea, which seems to be expressed elsewhere, that the proximity of the lands is immaterial, or that congress intended to grant anything like a general right to take timber from public land where it was most convenient. The grant was limited to adjacent lands, and I do not appreciate the logic which concludes that, if there be no timber on adjacent lands, the grant reaches out and justifies the taking of timber from distant lands,—lands fifty or a hundred miles away; nor do I understand that the rule controlling the construction of ordinary public grants, to the effect that they are construed strictly against the grantee, does not apply to these grants.

The first question is whether the railroad company can avail itself of both the special act of 1872 and the general grant of 1875. It was held by the district judge that it could, and I agree with him in that conclusion. It is unnecessary to do more than refer to the opinion filed by my Brother HALLETT for sufficient reasons for his conclusion. The principal question, however, is this: My Brother HALLETT was of the opinion that the place of use of the timber on the line of the railway was to be considered as well as the place of cutting, in determining the rightfulness of the appropriation by the company. He thought that the right

to cut timber extended to only so much timber as should be used in the construction of the road opposite, or nearly so, to the place of cutting; that if timber should be cut within a half mile of the road, and then carried on the cars of the company a hundred miles, and there used in the construction of the road, it could not be said to be taken, within the purview of the act, from adjacent lands. So he concluded that the right to take timber was limited by the place of use, and that, as each section of the road of reasonable length was completed, the right to take timber on lands adjoining such section was gone. In other words, the grant of timber was exhausted *pari passu* with the construction of the road. In this view, with all deference to the learned judge, I think he was mistaken. While grants of this nature are to be strictly construed, they are to be fairly construed, and so as to carry into effect the intent of the grantor. In determining what is granted, we of course look first to the language used. Now, in these grants the place of cutting, as well as the use to which the timber cut may be put, are both expressed. The place is the public lands adjacent to the line of the road. The use is the construction of the railroad, not a part of the railroad, but of the railroad as a whole, and of course including therein every part of it. It does not purport to grant the right to take timber from adjacent public lands for use in the construction of the railroad opposite the place of cutting, and these last words will have to be implied in order to place the limit on the grant given to it by the district judge. It would have been so easy to use such words of limitation that their omission makes strongly against an intent of such limitation. Let me make an illustration. Suppose the owner of a section of land made a grant to a railroad company of a strip 50 feet in width through his land for a right of way, and by the same instrument granted to the company the right to take stone and earth from land near this right of way for the purpose of constructing its road. This would be precisely parallel to the case at bar, the difference being only one of size. Now, would it be contended that under such a grant the company was limited for each rod of distance to the stone and earth which might happen to be opposite such rod? Would not a fair and reasonable construction, one expressing the intent of the grantor, be that the company could take stone and earth from any place which was near to the right of way for use in the construction of any part of the road through the section? If that would be true in the lesser illustration, would it not also be true in the larger case before us? Can it be that congress intended to aid in the construction of only a part of the railroad? It must have known that there were large extents of territory in this western country treeless, and without suitable stone for culverts and bridges. Did it mean to aid in the construction of such parts of the road as ran through a timber country, or where there was suitable stone, and leave the company unaided in the construction of other parts? It seems to me, both the language of the statute and the intent of the grantor are against the views entertained by my Brother HALLETT.

But, beyond this, the decision of the supreme court in the case of *U. S.* v. *Railroad Co.*, 98 U. S. 334, seems to me decisively against those

views.   In that case the facts were these:   By the nineteenth section of the act of July 2, 1864, there was granted to the railroad company, for the purpose of aiding in the construction of its road, every alternate section of public land (except mineral land) designated by odd numbers, to the amount of 10 alternate sections per mile on each side of the road on the line thereof not reserved, etc.   By the twentieth section, whenever 20 consecutive miles were completed and accepted, patents were to be issued to the company for land on each side of the road to the amount designated.   It was contended that this grant was to be measured by the separate sections of 20 miles of road, and that, to fill out the grant, land must be taken opposite each section, respectively.   But the court ruled otherwise, and held that the grant was in aid of the construction of the road as a whole, and might be filled out by lands anywhere along the line..   I quote the language of the opinion:

"The position that the grant was in aid of the construction of each section of twenty miles, taken separately, and must be limited to land directly opposite to the section, is equally untenable.   The grant was to aid in the construction of the entire road, and not merely a portion of it, though the company was not to receive patents for any land except as each twenty miles were completed.   The provision allowing it to obtain a patent then was intended for its aid.   It was not required to take it; it was optional for it then, or to wait until the completion of other sections or of the entire road.   The grant was of a quantity of land on each side of the road, the amount being designated at so many sections per mile, with a privilege to receive a patent for land opposite that portion constructed, as often as each section of twenty miles was completed.   If this privilege were not claimed, the land could be selected along the whole line of the road without reference to any particular section of twenty miles.   When lateral limits are assigned to a grant, the land within them must, of course, be exhausted before land for any deficiency can be taken elsewhere; and, when no lateral limits are assigned, the land department of the government, in supervising the execution of the act of congress, should undoubtedly as a general rule, require the land to be taken opposite to each section; but in some instances good reasons may exist why a selection elsewhere ought to be permitted.   If, as in the present case, by its neglect for years to withdraw from sale land beyond twenty miles from the road, the land opposite to any section of the road has been taken up by others, and patented to them, there can be no just objection to allowing the grant to the company to be satisfied by land situated elsewhere along the general line of the road."

This sustains me in the construction I place upon these grants, that only two things are necessary in determining the rightfulness of the appropriation of timber—*First*, that it be taken from public lands adjacent to the line of road; and, *second*, that it be used in the construction of the road.   This disposes of substantially all the questions in the case. One or two minor matters remain for notice.

As appears from the agreed statement of facts, a part of the road was completed before June 8, 1882, the time limited by the special act and its amendment; and a portion has been constructed since.   For convenience I shall call the first part the old line, and the latter part the new line.   Now, the special right given by the special act — that is, the right to take timber for repairs—is by the proviso specifically limited

to the old line, so that no timber can be taken from lands adjacent to it for repairs on the new line, and, conversely, none from land adjacent to the new line for repairs on the old. Again, for the rights granted under the general act both the old and the new lines are to be taken as parts of one road, so that timber can be taken from any part of the entire line for the construction of any part of the road provided for in the original organization. Again, I think there can be no doubt that section and depot houses, snow-sheds, and fences are properly to be considered, in the purview of the act, a part of the railroad.

I have not hitherto noticed the agreed statement of facts in the second case, for the matters that I have been considering dispose of every question in that case except that which arises upon the eighth paragraph, which is "that one-fourth of said timber has been used in the construction of new switches and side tracks along the line of road completed subsequent to June 8, 1882;" and that presents the question whether this timber was used in the construction of the railway. On the one side it is claimed that this refers to repairs, new switches, etc., being in lieu of old switches, etc. On the other hand it is claimed that this means absolutely new switches, etc.; that is, switches, etc., where there were none before. I think it immaterial which is the meaning. Of course, if repairs, it was unlawful, because upon the new line; and if, on the other hand, absolutely new switches and side tracks, they were upon a line of road already completed, so that they were merely additions, extensions, and improvements. The grant does not extend to these matters, but is exhausted when the line is once completed. Of course we all know that the developments of the country and increase of business will require constant additions; new depots, section-houses, switches, and side tracks. The demand for these will never be exhausted, but will continue as long as the surrounding country increases in population and business. Now, the grant was not intended to aid in supplying these successive demands. It was to aid in the first construction, and when that was completed the grant was exhausted. So, in either event, this appropriation of timber was unlawful.

Of course the supply of timber for other roads was not within the contemplation of the act.

This disposes of all questions in the case. From the views above expressed, it follows that the judgment of the district court in each case must be modified. In the first case judgment will be entered in favor of the government for the amount of timber shipped to the Utah lines, and for the $1,000 worth of timber cut on land adjacent to the new lines for repairs on the old; and in the second place judgment will be for the one-fourth which was used in the construction of new switches and side tracks.