UNITED STATES v. PRICE TRADING CO. et al.

(Circuit Court of Appeals, Eighth Circuit. April 19, 1901.)

No. 1,468.

1. PUBLIC LANDS—CUTTING OF TIMBER BY RAILROAD COMPANY—CONSTRUCTION OF STATUTE.

Under Act March 3, 1875 (18 Stat. 482), granting to railroads a right of way through the public lands of the United States, a railroad company constructing its line in conformity with its provisions, and which is thereby given the right to take timber from public lands adjacent to be used in the construction of its road, is authorized to take timber from lands adjacent to any part of its completed main line for use in the original construction of a branch line which it is authorized by its charter to build, although such branch is not constructed for several years after the main line.

2. SAME—TIMBER WRONGFULLY CUT—SUBSEQUENT SALE FOR AUTHORIZED USE.

Where timber has been wrongfully cut from public lands of the United States, and while in the hands of a purchaser has been claimed as the property of the United States by its agent, the title of the government cannot be devested by a subsequent sale of the timber by such purchaser to a railroad company for use in the construction of its road, although the company would have had the right to cut it for such purpose had it been standing.

3. SAME—CUTTING OF TIMBER FROM MINERAL LANDS—REGULATIONS GOVERNING.

The regulations prescribed by the secretary of the interior, under and pursuant to Act June 3, 1878 (20 Stat. 88), authorizing the cutting of timber from public mineral lands in certain states and territories for building, agricultural, mining, or other domestic purposes, which regulations require "every owner or manager of a sawmill, or other person felling or removing timber under the provisions of this act," to keep a record showing by whom such timber was cut, from what lands, evi-

dence of mineral character, to whom the timber was sold, and for what purpose, etc., and to take from each purchaser a written certificate, under oath, that the purchase is made for his own use, and for an authorized purpose, contemplate the keeping of such records only by persons who, like the proprietors of sawmills, make a business of cutting timber on mineral lands and selling ·it, or who are engaged to a considerable extent in such business, and they do not apply to settlers engaged chiefly in other pursuits, who cut small quantities of timber from mineral lands which they occupy, and who barter the same to a trader, with the understanding that it will be resold to other farmers or ranchmen in the vicinity for domestic uses, so as to render such cutting or sale unlawful, although the prescribed conditions are not complied with.   Sanborn, Circuit Judge, dissenting.

4. SAME—STATUTE GIVING RIGHT TO CUT TIMBER FROM MINERAL LANDS—RE
PEAL BY IMPLICATION.
   The right given by Act June 3, 1878 (20 Stat. 88), to citizens of the states of Colorado and Nevada, and the territories, excepting Washington, to cut timber from public mineral lands for certain domestic purposes, was not affected by the act of the same date (20 Stat. 89) for the sale of timber lands in the states of California, Oregon, Nevada, and in Washington territory, and which prohibited the cutting of timber on any public lands in those states and territory with intent "to export or dispose of the same," as amended by act of August 4, 1892 (27 Stat. 348), by striking ·out the names of the states and territory therein named, and inserting in lieu thereof the words "public-land states." The first act was special, and designed for the benefit of the residents of states and territories in many parts of which timber is scarce, and the amendment to the second act must be construed as authorizing the sale of timber lands in all other public-land states, and not as repealing by implication the privileges conferred by such special act.

5. APPEAL—DECISION—DISREGARD OF ERROR.
   It is only where there is no doubt that an error committed on the trial of a cause was without prejudice, and that a second trial must result in the .same judgment, that an appellate court may disregard such error, and affirm the judgment rendered.   Per Sanborn, Circuit Judge, dissenting.

6. PUBLIC LANDS—ACTION FOR UNLAWFUL CUTTING OF TIMBER—DEFENSE.
   To sustain a defense to an action by the United States to recover the value of timber conceded to have been cut from public lands, and which was purchased by defendant from sundry persons who cut the same, on the ground that the cutting was authorized and lawful, under Act June 3, 1878 (20 Stat. 88), and the regulations prescribed by the secretary thereunder, the defendant must prove (1) that the choppers who felled and removed the timber were bona fide residents of the state; (2) that the land from which it was cut was of strictly mineral character; (3) that such land was not subject to entry under existing laws of the United States, except for mineral entry; and (4) that the choppers sold the timber to citizens and bona fide residents of the state for the legitimate use of such purchasers for building, agricultural, mining, or other domestic purposes. Each of these facts is essential to such defense, without regard to whether rule 4 of the regulations requiring a record to be kept is applicable to the case, and the erroneous direction of a verdict for defendant in such a case cannot be held without prejudice, where the evidence in the record leaves a question for the jury upon either one of such facts.   Per Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Utah.

The United States instituted this action on May 12, 1899, against the defendants in error to recover the value of 12,346 fence posts, of the value of $987.68, alleging, in substance, that the posts had been unlawfully cut and removed from government lands. The case was tried principally upon an

agreed statement of facts, from which we cull the following admissions: The Price Trading Company is a mercantile corporation. A. Ballinger is its secretary. At the time alleged in the complaint the Price Trading Company had possession of 10,253 cedar posts, which had been cut upon the unsurveyed lands of the United States from six to ten miles. in a northerly direction from the town of Price, county of Carbon, in the state of Utah, by residents of said county, and the same had been purchased by the trading company from such residents for the sum of eight cents each in merchandise. The persons who cut and removed said posts knew that the lands from which they were cut were public lands of the United States, but they kept no record of the timber so cut and removed, in accordance with governmental regulations on that subject, and at the time the same were sold to the trading company they exacted no express agreement from the purchaser that the same should only be used for building, agricultural, mining, or other domestic purposes, within the state of Utah. It was. understood, however, and was the expectation of the parties, at the time of the sale, that the posts were purchased for the purpose of being sold to ranchmen in Carbon and other adjoining counties for the purpose of fencing agricultural and grazing lands. The posts were in the possession of the trading company for some time prior to April 20, 1899, and up to that time were held by the trading company with the intention of selling them for the purpose last mentioned. On March 20, 1899, while the posts were in the possession of the trading company, it was notified by a special agent of the general land office that the United States was the owner of the posts, and it was further notified not to sell or otherwise dispose of the same. On April 20, 1899, the Rio Grande Western Railway Company, by an instrument in writing, appointed the trading company its agent to obtain and deliver to the railway company 9,053 of the posts which had been cut and removed as aforesaid, to be used by said railway company in the construction of one of its branch lines of road hereafter described. Said posts were accordingly sold to said railway company for the sum of eight cents each, ·in pursuance of the aforesaid written appointment, and 7,000 of the posts were used by the railway company in fencing said branch line, and 2,053 of the posts were used in fencing a line of road termed the "Utah Eastern Railroad." Of the remaining 1,200 posts, 200 were used by the trading company in fencing its lands in Carbon county, and the residue, which were small and unfit for fence posts, were in the possession of the defendant company at the time the action was tried. The lands on which the posts in controversy were cut are adjacent to the main line of the Rio Grande Western Railway Company, which extends from the boundary line between the states of Colorado and Utah to Ogden City, Utah, and the timber was taken adjacent to that part of the railroad which passes through Carbon county. A branch line of said Rio Grande Western Railroad begins at Provo, Utah county, in said state of Utah, the latter town being on the main line, and runs thence, for a distance of 11 miles, through Provo Canyon, and connects with another railroad known as the "Utah Eastern Railroad," which latter road extends to Heber City, Utah, and is about 25 miles in length. The branch road aforesaid is connected at Provo with the main line of the Rio Grande Western Railroad, so that trains can run directly from the main over the branch line, and thence over the Utah Eastern Railroad. The Rio Grande Western Railway Company laid out and constructed its main and branch line, and the Utah Eastern Railway Company constructed its line in conformity to an act of congress entitled "An act granting to railroads a right of way through the public lands of the United States," which was approved March 3, 1875 (18 Stat. 482, c. 152), and both of said companies complied with all of the requirements of that act. The main line of the Rio Grande Western Railroad was constructed about the year 1885. The construction of said branch line through Provo Canyon, and the construction of the Utah Eastern Railroad, was commenced in April, 1899, and was completed after the institution of the present action. The trial court in its charge to the jury instructed them, in substance, that under the act of March 3, 1875, a railroad company could take timber from public land adjacent to any part of its entire line for the construction of any part of its road, and that this right included the right to take timber

109 F.—16

for the construction of snowsheds, fences, etc., used by it at the time the road was built. To this part of the charge an exception was reserved. It further instructed the jury, in substance, that the act of congress did not require a railroad company to make the selection or take the timber itself, but that it authorized any person who contracts with a railroad company for the building of its road to take the necessary material for that purpose, and that such persons became substituted in this respect to the right of the company. In the same connection it made the following statement, to which an exception was taken: "The same rule would apply to a person not under contract or in the employment of the company. If he cuts timber on public lands adjacent to the line of the railroad (the railroad company having the right to take the timber), and afterwards disposes of it to the company to be used in the construction of its road, and it is so used, neither such person nor the company are liable as wrongdoers." The court further instructed the jury, in substance, and to that portion of its charge an exception was also taken, that as respects the 7,000 posts taken from lands adjacent to the main line of the Rio Grande Western Railroad, where it passes through Carbon county, which were used in the construction of its branch line through Provo Canyon, there could be no recovery. Under these instructions, the government recovered a verdict and judgment for the sum of $20.53 only, and it has removed the record to this court for review.

Charles O. Whittemore (Pennel Cherrington, on the brief), for plaintiff in error.

George Sutherland, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

One of the principal contentions on the part of the government is that the instruction of the trial court to which reference is first made in the statement was misleading, for the reason that it conveyed the idea that timber might be taken from land adjacent to any part of the main line of the Rio Grande Western Railroad, which was completed as early as the year 1885, for the original construction of the branch line through Provo Canyon, the building of which was not commenced until some time in April, 1899. It is claimed on the part of the government that timber could not be taken from lands adjacent to the main line for the construction of the branch line; that the branch line was a mere addition to a road which was fully completed; and that the permission given by the act of March 3, 1875 (18 Stat. 482, c. 152), to take timber from public lands for the construction of railroads, ceased to be operative on the completion of the main line in the year 1885. To sustain these propositions, reliance is placed on the decision in Denver & R. G. R. Co. v. U. S. (C. C.) 34 Fed. 838, which was subsequently affirmed by the supreme court of the United States. 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975. In the last-mentioned case it was expressly determined that timber might be taken from public lands adjacent to any part of a railroad to which the act is applicable, for use in the construction of any part of the road, no matter how distant it might be from the place where the timber was taken; that timber might be taken for the building of fences and snowsheds along the line of a railroad, these being properly included in the term "railroad"; and that the act in question, in view of the purpose which congress

had in view, should be given a more liberal interpretation than is given to an ordinary private grant. The point adjudicated in that case upon which particular stress is laid is that after a railroad is fully completed the privilege ceases, and that timber cannot subsequently be taken from public lands for the construction of "absolutely new switches and side tracks," these being merely additions or improvements to a road already completed. The reason given for this ruling was that congress did not intend that timber might be taken for all time from public lands to make such additions to a railroad once completed as the development of the country might require.

Now, conceding, for present purposes, that counsel place a correct interpretation upon the instruction which was given by the trial court, we are of opinion that it was not erroneous. The point adjudicated in the case of Denver & R. G. R. Co. v. U. S., upon which stress is laid, does not, in our judgment, control the case at bar, because the timber which is now involved was taken for the original construction of a branch line of road which the Rio Grande Western Railway Company, as it seems, was fully authorized by its charter to construct, but had deferred building until a more convenient season. As counsel for the defendants in error well observe, the "main line" and the "branch line," so termed, together constitute a single railroad, just as the trunk and branches of a tree constitute a single tree. If the work of constructing what is termed the "main line" had been suspended for a season after some sections thereof were completed and in operation, and work thereon had been afterwards resumed, we think that it could not have been successfully claimed that the right to take timber from public lands adjacent to the completed sections for the extension of the road to its authorized termini was lost, and we can discover no greater reason for denying the right of the railway company to take timber from land adjacent to its completed main line for the original construction of the branch line which it was authorized by its charter to construct. The same reasons of public policy which induced congress to authorize the use of timber standing on public lands for the construction of what are termed "main lines" exist with respect to the construction of authorized branch lines, and, in the absence of any provision limiting the privilege to the construction of main lines, it will be presumed that congress intended it to extend to the original construction of branch lines. The entire authorized structure, consisting of main line and branches, must be regarded as forming a single railroad, and the privilege granted to take timber from public lands adjacent thereto must be considered as applicable to the original construction of any part of the road which was authorized to be built. It follows, therefore, that there was no error in the court's instruction.

The second instruction of the trial court of which complaint is made enunciated the proposition as applied to the agreed facts of the present case, or, at least, it warranted such an inference, that if the timber was such as the railroad company might have taken for the construction of its branch line, then it mattered not whether

the timber had been rightfully or wrongfully cut and removed from government land, and sold to the Price Trading Company, inasmuch as it had eventually come to the possession of one who had the right, so long as it was standing, to cut and appropriate it.

We feel constrained to hold that this is an erroneous doctrine. The government asserted its title to the timber in controversy through an agent of the land department on March 20, 1899, and warned the trading company at that time not to dispose of it. It further asserted its title by bringing this action in replevin about two months later. The appointment which the trading company obtained from the railroad company to cut fence posts on public lands for the fencing of its road, and under which the trading company turned over the posts in controversy to the railroad company, was not received until the latter part of April or early in May, 1899, long after the posts had been cut and removed. The cutting, removal, and sale of the timber, if wrongful, did not devest the government of its title, but, at most, merely changed what had before been realty into personalty, without affecting the owner's title to the property in any respect. The law to this effect is well settled. Bolles Wooden-Ware Co. v. U. S., 106 U. S. 432, 435, 1 Sup. Ct. 398, 27 L. Ed. 230. The timber being the property of the United States, notwithstanding its sale to the trading company, it is impossible to admit that it could be devested of that title by any arrangement between the trading company and the railroad company to which it did not give its assent. The instruction, therefore, was well calculated to mislead the jury.

It is urged, however, in behalf of the defendants in error, that the timber was rightfully cut and sold, and that the trading company acquired a good title by its purchase, and, if this position is well taken, the misleading character of the instruction last mentioned is immaterial, and may be disregarded. Hence it becomes necessary to determine if under the evidence this view is tenable. The contention on the part of the trading company is, in substance, that the cutting and removal of the timber, under the circumstances disclosed in the agreed case, was authorized by the act of June 3, 1878 (20 Stat. 88, c. 150), entitled "An act authorizing the citizens of Colorado, Nevada and the territories to fell and remove timber on the public domain for mining and domestic purposes." This act provides that all citizens of the United States and other persons who are bona fide residents of the states of Colorado or Nevada, or the territories of New Mexico, Arizona, Utah, Wyoming, Dakota, Idaho, or Montana, and other mineral districts of the United States, "are * * * authorized and permitted to fell and remove for building, agricultural, mining, or other domestic purposes, any timber or other trees growing or being on the public lands, said lands being mineral, and not subject to entry under existing laws of the United States, except for mineral entry, in either of said states, territories, or districts of which such citizens or persons may be at the time bona fide residents, subject to such rules and regulations as the secretary of the interior may prescribe for the protection of the timber and of the undergrowth growing upon such lands, and for other pur-

poses." Pursuant to the authority conferred by this statute, the secretary of the interior, on August 5, 1886, prescribed, among others, the following regulations:

"(4) Every owner or manager of a sawmill, or other person felling or removing timber under the provisions of this act, shall keep a record of all timber so cut or removed, stating time when cut, names of parties cutting the same or in charge of the work, and describing the land from whence cut by legal subdivisions if surveyed, and as near as practicable if not surveyed, with a statement of the evidence upon which it is claimed that the land is mineral in character, and stating also the kind and quantity of lumber manufactured therefrom, together with the names of parties to whom any such timber or lumber is sold, dates of sale, and the purpose for which sold, and shall not sell or dispose of such timber, or lumber made from such timber, without taking from the purchaser a written agreement that the same shall not be used except for building, agricultural, mining, or other domestic purposes within the state or territory; and every such purchaser shall further be required to file with said owner or manager a certificate, under oath, that he purchases such timber or lumber exclusively for his own use and for the purposes aforesaid. (5) The books, files, and records of all millmen or other persons so cutting, removing, and selling such timber or lumber, required to be kept as above mentioned, shall at all times be subject to the inspection of the officers and agents of this department. (6) Timber felled or removed shall be strictly limited to building, agricultural, mining, and other domestic purposes within the state or territory where it grew."

In view of the form in which these regulations are cast, it is urged that, by virtue of a well-known rule of construction (ejusdem generis, —Suth. St. Const. § 268), the persons who are required to keep a record of timber cut and removed are the proprietors or managers of sawmills, or persons of a like class who are engaged all the time or to a considerable extent in cutting standing timber and manufacturing it into some form for sale; that as the persons who cut the fence posts in controversy were not persons of that class, and that inasmuch as there was an understanding between them and the Price Trading Company that the posts would be disposed of to farmers and ranchmen in Carbon county, Utah, for fencing, the cutting and removal was lawful, and the trading company acquired a good title, although no record was kept.

We are of opinion that the construction of the regulation aforesaid which is contended for by the defendant company is correct; that is to say, that the rule contemplates that a record shall be kept by those who are engaged in operating sawmills or who are engaged to a considerable extent in felling timber on mineral lands, and cutting it into some form suitable for building, agricultural, mining, or other domestic uses. This is not only the interpretation of the regulation which the rule of law above mentioned requires, but, in our judgment, it would be unreasonable to place a construction on the regulation which would require every ranchman who goes on mineral land to cut a little timber for his own use, and every occupant of such land who occasionally cuts a small quantity of timber thereon, and sells it to his neighbor for fencing and other domestic uses, to keep the elaborate record which the regulation prescribes. The act of congress was intended to enable settlers in those regions where timber is scarce to utilize it so far as is necessary for domestic and mining purposes, and it will not be presumed

that the regulation was intended to place embarrassing and unnecessary obstructions in the way of such use. Some persons, perhaps, who would have occasion to use timber for the purposes defined by the act, might not be able to keep the prescribed record, or to keep it in such exact form as would protect them from prosecution as trespassers. The regulation, then, so far as the keeping of the prescribed record is concerned, must be held applicable to those persons who, like the proprietors of sawmills, are engaged to a considerable extent or who make a business of cutting timber on mineral land and selling it. It was intended to impose on persons of that class the duty of providing themselves with suitable books, and keeping a record of timber cut and removed, so that the government could readily ascertain, by an inspection of the record, the amount cut, and whether it had been devoted to lawful uses.

The agreed statement of facts on which the case was tried below recites that the persons who cut the fence posts in controversy were residents of the county of Carbon, and that the posts were taken by the Price Trading Company in exchange for merchandise; and, as no further facts are disclosed by the record, we must infer that the residents referred to were occupants of small tracts of land in Carbon county; that they were engaged in mining or farming on the lands which they severally occupied; that to maintain themselves and their families they severally cut small quantities of cedar posts on the land, and bartered them to the trading company for such supplies as they needed; and that the latter company purchased them with the expectation of selling them to other farmers and ranchmen of Carbon county for fencing. Assuming such to be the circumstances under which the timber was cut and removed, and that it was taken from mineral lands, as the jury appear to have found, we think that the fact that no record was kept of the cutting did not in itself impair the trading company's title.

Counsel for the government contend, however, that the act of June 3, 1878, last above mentioned, does not at the present time authorize any one to take timber from mineral land, except for his own immediate use, and that under no circumstances can one cut timber for sale to other persons, either for mining, building, agricultural, or other domestic purposes. This conclusion is deduced in the following manner: On the same day that the act last aforesaid was passed, to wit, on June 3, 1878, congress enacted another law (20 Stat. 89, c. 151), entitled "An act for the sale of timber lands in the states of California, Oregon, Nevada and in Washington territory." The first section of the latter act provided, in substance, that the surveyed public lands of the United States within the states and the territory mentioned in the title of the act, which were chiefly valuable for timber and were unfit for cultivation, might be sold to citizens of the United States, or persons who had declared their intention to become such, in quantities not exceeding 160 acres to any one person, at a minimum price of $2.50 per acre. The second and third sections of that act prescribed the manner in which such timber lands as were made subject to sale might be acquired, and among other things required an applicant for purchase to show by his ap-

plication that the land was unfit for cultivation, and was chiefly valuable for timber and stone; that the purchase was made in good faith, for his own exclusive use, and not for the purpose of speculation; and that he had not entered into an agreement with any person by which the title that he wished to acquire from the government was to be transferred to, or inure to the benefit of, any other person. Then followed a fourth section, which was as follows, so far as it is deemed necessary to quote the same in hæc verba:

"Sec. 4. That after the passage of this act it shall be unlawful to cut, or cause or procure to be cut, or wantonly destroyed, any timber growing on any lands of the United States, in said states and territory or remove, or cause to be removed, any timber from said public lands, with intent to export or dispose of the same; and no owner, master, or consignee of any vessel, or owner, director, or agent of any railroad, shall knowingly transport the same, or any lumber manufactured therefrom; and any person violating the provisions of this section shall be guilty of a misdemeanor, and on conviction, shall be fined for every such offense a sum not less than $100 nor more than $1,000."

By an act of congress which was approved on August 4, 1892 (27 Stat. 348, c. 375), the act last above mentioned was amended by striking out the words, "states of California, Oregon, Nevada and Washington territory," where the same occur in the second and third lines of the act, and inserting in lieu thereof the words "public-land states." It is very clear that the act of June 3, 1878, relating to the sale of timber lands, which for convenience will be termed the "second act" passed on that day (although it does not appear which act was first passed), had no effect upon the first act, because it related to different states, except the single state of Nevada, which is mentioned in both enactments. It is claimed, however, that when the second act was amended by the act of August 4, 1892, it then operated to take away certain privileges that had been conferred by the first act, and that after August 4, 1892, no occupant of mineral land in the states named in the first act of June 3, 1878, to wit, Colorado, Nevada, Utah, Wyoming, Dakota, Idaho, and Montana, and the territories of New Mexico and Arizona, could cut a single stick of timber and sell it to his neighbor for building, agricultural, mining, or other domestic purposes without committing a criminal offense.

We have not been able to adopt that view of the legislation in question. The first act of June 3, 1878, was in its nature a special act, limited in its operation, and designed for the benefit of the inhabitants of states and territories in many parts of which timber is exceedingly scarce. The second act of the same date dealt with a different subject-matter. It authorized the sale of timber lands in small tracts in four states where timber is more abundant; and having exposed such lands for sale, and provided a means whereby timber could be lawfully acquired, it prohibited, under suitable penalties, the cutting of timber on public lands in those states with intent "to export or dispose of the same." The amendment to that act on August 4, 1892 (27 Stat. 348, c. 375), was only intended, in our judgment, to extend the provision authorizing the sale of timber lands to all "public-land states." We can discover nothing in

the act of August 4, 1892, which leads us to suppose that congress intended to withdraw the privilege which it had conferred by the first act of June 3, 1878, on residents of those states and territories where there was a dearth of timber, to devote such timber as was found standing on mineral lands to building, agricultural, mining, and other domestic uses. We are of the opinion that the privilege so conferred was not intended to be affected, and was not in fact affected, by subsequent legislation. Repeals by implication are not favored, especially when a privilege like the one now under consideration is conferred by an act which is limited in its operation, and is in its nature special. If it was the intention of congress to qualify or place any restrictions upon the exercise of the right which was conferred by the first act of June 3, 1878, the intent should have been more clearly expressed and not left clouded with so much of doubt and uncertainty. These views are confirmed by the provisions of an act of congress approved March 3, 1891 (26 Stat. 1093, c. 559), which latter act, as amended by a recent act approved on March 3, 1901, so as to include the state of Nevada, declares that in the states of Colorado, Montana, Idaho, North Dakota, South Dakota, Nevada, and the district of Alaska, in any criminal prosecution or civil action by the United States for a trespass on timber lands or to recover for timber or lumber cut thereon, it shall be a defense if the defendant shows that the timber was so cut or removed from such lands for use in such state or territory by a resident thereof for agricultural, mining, manufacturing, or domestic purposes, under rules and regulations prescribed by the secretary of the interior, and has not been transported out of the same. It results from what has been said that the present record discloses, presumptively at least, that the trading company had a good title to the posts in controversy when the government first saw fit to challenge its title to the same; and it cannot be said that its subsequent election to sell them to the railroad company instead of disposing of them to farmers and ranchmen of Carbon county for fencing purposes, as it at first intended to do, alters its rights in any respect. Finding no material error in the record, the judgment below is affirmed.

SANBORN, Circuit Judge (dissenting). The defendants below interposed two defenses in this action: (1) That the posts were taken by the Rio Grande Railway Company for the construction of its railroad under the act of March 3, 1875 (18 Stat. 482, c. 152); and (2) that they were cut and removed by persons authorized to do so under the act of June 3, 1878 (20 Stat. 88, c. 150). At the close of the trial the court peremptorily instructed the jury (1) that the defendants had justified their taking of 7,000 of the posts, because, after they were unlawfully cut and removed from the land of the government, the defendants had been appointed agents of the railway company to procure posts for it, and had sold and delivered to the railway company these 7,000 posts, which they had previously purchased; and (2) that the defendants had entirely failed to establish their second defense, that the United States were entitled to damages for all the posts which the defendants had purchased which were not in-

cluded in the 7,000 which they had sold to the railway company, and that the only question left for the determination of the jury was the amount of the damages which the government had suffered from the taking of the 3,253 posts. This court is unanimous in the opinion that the court below erred in its conclusion that the defendants succeeded in justifying their taking of the 7,000 posts under the act of 1875, and it is certain that this error deprived the United States of a recovery of the value of the 7,000 posts which they must have secured at the trial below if this error had not been committed, because these 7,000 posts were in the same situation, as to the defense under the act of 1878, as were the 3,253 posts whose value the court instructed the jury that the government was entitled to recover. This state of the case entitles the government to another trial of this action.

The majority of the court refuses this second trial, notwithstanding the error, because, in its opinion, the rules established by the secretary of the interior under the act of 1878 did not require the choppers who cut and removed this timber from the government land to comply with the provisions of rule 4. Conceding for the moment that this rule did not apply to these choppers, the conclusion deduced by the majority does not follow, and the judgment should not be affirmed, but the case should be remanded for a second trial, because the defendants failed to establish that they were entitled to cut this timber in the absence of rule 4. Upon this subject the supreme court said in Railroad Co. v. Lewis, 162 U. S. 366, 376, 16 Sup. Ct. 831, 834, 40 L. Ed. 1002, 1006:

"The absolute ownership of these lands being at the time in the United States, it had, as owner, the same right and dominion over them as any owner would have. No one had the right to enter upon the lands; no one had the right to cut a stick of timber thereon without its consent. Any one so going upon the lands, and cutting timber, would be guilty of the commission of an act of trespass. The government, however, chose to make some exceptions in favor of certain classes of people to whom were given the right to cut timber for certain purposes: (1) They were to be citizens of the United States; (2) bona fide residents of the state or territory mentioned in the act; (3) they were to be permitted to fell and remove any timber or trees growing or being on the public lands, provided they were mineral, and not subject to entry under existing laws of the United States, and they were authorized and permitted to fell and remove such timber only for building, agricultural, mining, and other domestic purposes. The cutting and removing were to be done under rules and regulations prescribed by the secretary of the interior. Outside of these exceptions, there was no right in any person to cut a particle of timber on these public lands of the government. The right to cut is exceptional and quite narrow, and for specified purposes only. The broad general rule is against the right. If the plaintiffs had acquired the right by reason of a compliance with the provisions of the statute, the facts should have been shown by them. The presumption, in the absence of evidence, is that the cutting is illegal. U. S. v. Cook, 19 Wall. 591, 22 L. Ed. 210."

Rules 2 and 3 promulgated by the secretary under this act of 1878 read:

"(2) The land from which timber is felled or removed, under the provisions of the act, must be known to be of a strictly mineral character, and that it is 'not subject to entry under existing laws of the United States, except for mineral entry.'

"(3) No person not a citizen or bona fide resident of a state, territory, or other mineral district provided for in said act is permitted to fell or remove timber from mineral lands therein; and no person, firm, or corporation felling or removing timber under this act shall sell or dispose of the same, or the lumber manufactured therefrom, to any other than citizens and bona fide residents of the state and territory where such timber is cut, nor for any other purpose than for the legitimate use of said purchaser for the purpose mentioned in said act."

Under these rules and this decision of the supreme court, it was therefore incumbent upon the defendants to establish each of the following propositions, in the absence of rule 4, before they could bring themselves within the exception of the act of 1878, and could escape liability for the 7,000 posts which were taken from the lands of the government: First, that the choppers who felled and removed the posts were bona fide residents of the state of Utah; second, that the land from which the posts were felled and removed was of a strictly mineral character; third, that the land from which the posts were taken was "not subject to entry under existing laws of the United States, except for mineral entry"; fourth, that these choppers sold the posts to citizens and bona fide residents of the state of Utah for the legitimate use of such purchasers for building, agricultural, mining, or other domestic purposes. A failure to establish either one of these four propositions was as fatal to their defense under the act of 1878 as a failure to establish them all, because the existence of each one of them was made by that act a condition of their right to the posts. Not only this, but the record in this court must show that the defendants proved each of these propositions by evidence so conclusive that there is no doubt that a court and jury would be compelled upon another trial to find each of these issues in their favor before this court has the power to deprive the government of a second trial of this case by the jury. It is only when there is no doubt what the result of another trial must be, no doubt that the error at the first trial created no prejudice, that an appellate court may disregard that error and affirm the judgment. The presumption always is that error produces prejudice, and the latest decision of the supreme court rules that it must appear beyond doubt that the error did not prejudice, and could not have prejudiced, the party who complains of it, before a new trial can be lawfully denied. Mexia v. Oliver, 148 U. S. 664, 673, 13 Sup. Ct. 754, 37 L. Ed. 602; Deery v. Cray, 5 Wall. 797, 807, 18 L. Ed. 653; Gilmer v. Higley, 110 U. S. 47, 50, 2 Sup. Ct. 471, 28 L. Ed. 62; Association v. Shryock, 73 Fed. 774, 781, 20 C. C. A. 3, 11, 36 U. S. App. 658, 671; Railroad Co. v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 172, 30 L. Ed. 299; Durant Min. Co. v. Percy Consol. Min. Co., 93 Fed. 166, 169, 35 C. C. A. 252, 256; Cattle Co. v. Martindale, 63 Fed. 84, 90, 11 C. C. A. 33, 39; Brown v. Coal Co., 72 Fed. 96, 18 C. C. A. 444, 42 U. S. App. 675.

It does not appear from this record that the defendants have conclusively established, or that they can conclusively prove, their defense under the act of 1878, so that the United States cannot recover the value of the 7,000 posts. In the first place, they failed at the former trial to produce any evidence whatever to establish one of

the indispensable conditions of their right to these posts, namely, that the land from which they were taken was "not subject to entry under existing laws of the United States, except for mineral entry." In the second place, the evidence which they presented of the mineral character of the land was so general, unsatisfactory, and illusory that it cannot be said that the minds of all reasonable men would be compelled thereby to conclude that the posts were taken from mineral land. It consisted of the testimony of two witnesses, who acknowledged that they did not know from what land the posts were taken, to the effect that in some places on lands from 4 to 14 miles northwest of Price there were veins of coal and traces of the precious metals, but there was no testimony that there was either coal or ore on any of the tracts of land from which any of the posts in controversy were taken. From this evidence a jury might well find, and ought to find, that the mineral character of the land from which these posts were taken was not established. In the third place, the defendants stipulated with the government that those who cut and removed these posts from the land of the United States did not sell them to a purchaser for his own use for building, agricultural, mining, or other domestic purposes, as required by the secretary's rule 3, but that they sold them to the Price Trading Company, a corporation, to be sold by it again as an article of merchandise. Now, there is no presumption that the defendants can prove any more on another trial than they established upon the former trial, and, if they do not, the United States will certainly be entitled to recover the value of the 7,000 posts, whether or not rule 4 has any application to those who cut and removed them. Thus it does not appear beyond doubt that the error of the court below in sustaining the first defense has not deprived the government of a recovery of the value of the 7,000 posts, notwithstanding the second defense.

On the other hand, this record conclusively demonstrates the position that this error of the court below did have exactly that effect. The trial court charged the jury that the second defense was not established, and that the government was entitled to recover, and it did recover, the value of 3,253 posts not taken by the Denver & Rio Grande Railway Company. The facts which conditioned the second defense to the taking of the 7,000 posts were the same as those which conditioned the taking of the 3,253 posts, and it is manifest that the court below would have directed a judgment for the value of the 7,000 posts if it had not fallen into the error of sustaining the first defense as to them. In this way it conclusively appears that the error of the court below deprived the government of a verdict and judgment for the 7,000 posts. Inasmuch as that error did prejudice the United States in the former trial, and inasmuch as it does not appear beyond doubt that they cannot recover the value of these posts in another trial, and it does appear clearly that they can do so unless the defendants produce more and better evidence than they presented at the previous trial, the judgment should be reversed, and the case should be remanded for a new trial.

There is another reason why a new trial of this case should be

granted. The question whether or not the rule "ejusdem generis" is applicable to the secretary's rule 4 here does not appear to have been presented to, or considered by, the trial court, and it has not been discussed by counsel for the government in this court. It is suggested by counsel for the defendants in error, a single page of his brief is devoted to it, and a single authority (Suth. St. Const.) is cited in support of its application. The contention that this rule 4 of the secretary applies only to the owner or manager of a sawmill, and to other persons who are engaged much of the time in cutting or manufacturing timber taken from government land for sale, is novel, contrary to the ordinary meaning of the words of the rule, and to the previous construction and application of it by the courts, and it ought not to be adopted without exhaustive argument and careful consideration. It seems to me that it ought not to be adopted at all. The rule that where general follow particular words the former must be confined to things of the same kind as those specified by the latter is a subordinate, specific rule of construction. It is subordinate to the general principle that the intent of the law-making power must prevail over technical rules of construction, and to the general rule that words and phrases must ordinarily have their usual signification. Upon this subject, Sutherland, in section 279, says:

"The sense in which general words, or any words, are intended to be used, furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning will be given, according as the intention is thus indicated. To deny any word or phrase its known and natural meaning in any instance, the court ought to be quite sure that they are following the legislative intention. Hence, though a general term follows specific words, it will not be restricted by them when the object of the act and the intention is that the general word shall be understood in its ordinary sense."

In my opinion, the object of the rule of the secretary and the intention were to use the general words "or other person," in the first line of rule 4, which reads, "Every owner or manager of a saw-mill or other person felling," in their ordinary, natural sense, to cover and include, with the owner and manager of the sawmill, every other person whomsoever who should fell or remove timber from the lands of the government under the act of 1878. That act authorized the secretary to make general rules and regulations applicable to all who should undertake to exercise the privileges it granted. It was such general rules applicable to all that the secretary undertook to make. He made nine rules. They are all general. They all apply by their terms to all persons felling or removing timber under the act. The second and third have been quoted above. They apply to all land covered by the act, and to all persons cutting timber thereunder. Rule 7 reads: "No person will be permitted to fell or remove any growing trees of any kind whatsoever less than eight inches in diameter." Since the other eight rules apply to all persons who invoke the privileges of the act, and the terms in them have their ordinary, natural signification, the words "or other person" in rule 4 should have the same interpretation, under the rule noscitur a sociis.

Again, that interpretation which strengthens and makes the rule effective, rather than that which emasculates and paralyzes it, should be adopted. If the construction of the majority prevails, the rule becomes practically useless. All that the owner or manager of a sawmill or any other person of his class needs to do to avoid compliance with it is to purchase his timber of choppers and teamsters who fell and remove it from the land, and no one will be required to keep any record or do any of the acts prescribed by the rule. Such an interpretation practically nullifies the rule, and it ought not to be adopted, in the face of the fact that the ordinary meaning of its terms will preserve and make it effectual. No such construction as this has ever before been suggested by the courts which have been engaged for more than a decade in enforcing this rule, but it has been applied indiscriminately to all persons, of every class, who felled and removed timber under the act of 1878. In Railroad Co. v. Lewis, 162 U. S. 366, 367, 376, 16 Sup. Ct. 831, 40 L. Ed. 1002, 5,000 cords of the wood there in question had been purchased from individual choppers, as in this case, while the claimants themselves felled and removed 10,000 cords; but no distinction was made between the two classes of persons who had been engaged in taking the timber, and the court applied the rules of the secretary to both alike. All the cases under the act of 1878 have been tried upon this theory. U. S. v. Reder (D. C.) 69 Fed. 965; Gentry v. U. S., 101 Fed. 51, 41 C. C. A. 185; Stubbs v. U. S., 104 Fed. 988, 44 C. C. A. 292.

Finally, the construction proposed by the majority makes a rule which is now plain, certain, and practical, uncertain, impractical, and incapable of enforcement. It is said in the opinion of the majority that this rule requires owners and managers of sawmills "or persons of a like class who are engaged all the time or to a considerable extent in cutting standing timber or manufacturing it in some form for sale" to comply with the provisions of rule 4. Who are persons of like class? What is a considerable extent? Is one who is the owner or manager of a dozen teams that are engaged in removing the timber from the land of the government of a like class with the owner or manager of a sawmill? Is one who cuts standing timber for sale from the lands of the government for five months of the year cutting it to a considerable extent? How many posts must one cut to constitute a cutting to a considerable extent? How long must he cut to come within the rule? These questions must be definitely answered before this new rule can be successfully enforced. The truth is that the words which the secretary used have a plain, ordinary meaning, and when they are read in that sense the rule is plain, certain, and practical in purpose and in effect. Rule 4 should be read and applied in this sense, and the restricted interpretation of the majority should not prevail, because it is contrary to the plain, natural meaning of the words which the secretary used, to the intention and to the purpose of his rule, because it renders that rule so uncertain in its terms and effect that it will be incapable of enforcement, and because the practical effect of this new interpretation will be to relieve all persons from a com-

pliance with any of the provisions of the rule. The judgment below should be reversed, and the case remanded to the court below for a second trial.