UNITED STATES v. DENVER & R. G. R. CO. et al.

(Circuit Court, D. Colorado. August 29, 1911.)

No. 4,377.

1. PUBLIC LANDS (§ 93*)—INJUNCTION (§ 197*)—JURISDICTION—SUIT TO RESTRAIN WASTE.

A bill by the United States against a railroad company and others, alleging that such company, claiming the right under an act of Congress, has, through its codefendants as its agents, unlawfully cut and removed timber from the public lands, that it and its codefendants are wantonly abusing the license given by such act, and committing waste in taking such timber for private and unauthorized purposes, states a cause of action cognizable in equity for relief by injunction, and the court having assumed jurisdiction may decree full and final relief, including damages.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 93;* Injunction, Cent. Dig. § 417; Dec. Dig. § 197.*]

2. PUBLIC LANDS (§ 88*)—GRANT OF RIGHTS TO RAILROAD COMPANY—CONSTRUCTION OF ACT.

By Act June 8, 1872, c. 354, 17 Stat. 339, as amended by Act March 3, 1877, c. 126, 19 Stat. 405, the Denver & Rio Grande Railway Company was granted right of way over the public lands and the right to take timber and other material for its construction and repair from the public lands adjacent thereto, "provided that said company shall complete its railway as far south as Santa Fé within ten years of the passage of this act and shall complete 50 miles additional south of said point in each year thereafter; and in default thereof the right and privileges herein granted shall be rendered null and void so far as respects

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the unfinished portion of said road." The southern terminus of the company's line as fixed by its articles of incorporation was El Paso, in Mexico, which was intended to be reached by following the valley of the Rio Grande through Santa Fé. The company subsequently entered into a contract with other companies by which it preluded itself from building its line to Santa Fé or down the Rio Grande Valley, but which left it free to build as far south to the westward. *Held*, that such contract was not an abandonment of its line, and did not affect its rights under the grant.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 88.*]

3. PUBLIC LANDS (§ 85*)—GRANT OF RIGHTS TO RAILROAD COMPANY—LOCATION OF LINE.

The line of railroad constructed by the Denver & Rio Grande Railway Company from Antonito, on its main line westward across the divide separating the waters of the Great Colorado from the Rio Grande and extending to Durango, *held* to be the "San Juan Railway" authorized by its articles of incorporation, and entitled to the grant of right of way and timber rights conferred on the company by Act June 8, 1872, c. 354, 17 Stat. 339, as amended by Act March 3, 1877, c. 126, 19 Stat. 405.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 259; Dec. Dig. § 85.*]

4. PUBLIC LANDS (§ 93*)—GRANTS TO RAILROADS—RIGHT OF WAY THROUGH INDIAN RESERVATION—"PUBLIC LANDS" DEFINED.

By Act June 8, 1872, c. 354, 17 Stat. 339, as amended by Act March 3, 1877, c. 126, 19 Stat. 405, defendant the Denver & Rio Grande Railway Company was granted right of way over the public lands, and the right to take timber, stone, etc., from such lands adjacent to its several projected lines one of which extended through the then existing Ute Indian reservation, which covered a tract 125 by 200 miles in extent in southwest Colorado, and had been set apart by treaty for the exclusive use of the Indians, but with a reservation of the right by proclamation of the President to appropriate right of way for the construction through the reservation of any railroad authorized by law. Such a proclamation was issued on behalf of the defendant in 1880, and it thereafter constructed its line through the reservation. Prior to such construction Congress had also ratified an agreement with the Indians by which their rights in the reservation were extinguished, except as to allotments in severalty. *Held*, that the words "public lands," as used in the grant, must be construed as including lands within the reservation, and that the act gave defendant the right to take the timber and other materials from such lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 283; Dec. Dig. § 93.*

For other definitions, see Words and Phrases, vol. 6, pp. 5793–5795; vol. 8, p. 7772.]

5. PUBLIC LANDS (§ 93*)—RECOVERY OF DAMAGES FOR CUTTING OF TIMBER—ESTOPPEL.

The United States is not estopped to recover damages from a railroad company for timber cut and removed from public lands under a claim of right given by a congressional grant, which was a mere license to the company to use timber from lands adjacent to its line for construction purposes, by the acquiescence of government agents in such taking, if it was, in fact, unauthorized and unlawful.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 93.*]

6. JUDGMENT (§ 707*)—CONCLUSIVENESS OF ADJUDICATION—NATURE OF ACTION.

A plea of res judicata as estoppel inter omnes must be based on a judgment in a proceeding purely in rem.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. § 707.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. PUBLIC LANDS (§ 93*)—GRANT OF TIMBER RIGHTS TO RAILROAD COMPANY – "ADJACENT LANDS."

Under a grant to a railroad company of the right to cut timber for construction purposes from the public lands "adjacent" to its line, lands more than three miles from the line of the right of way, measured at right angles thereto, are not adjacent, while those within that limit are adjacent.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 93.*

For other definitions, see Words and Phrases, **vol. 1,** pp. 184–187; vol. 8, pp. 7565, 7566.]

8. PUBLIC LANDS (§ 93*)—GRANT OF TIMBER RIGHTS TO RAILROAD COMPANY— "REPAIR."

Under a grant to a railroad company of the right to cut timber from adjacent public lands "for the construction and repair" of its road, where neither the grant nor the company's articles of incorporation specified the kind of road to be built, it was optional with the company to build either a broad or narrow gauge, and, having constructed a narrow-gauge road, it had no authority to take timber to make the same over into a broad gauge, which was reconstruction, and not repair, but it did have the right to take such timber to keep the road in repair after such change had been made.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 283; Dec. Dig. § 93.*

For other definitions, see Words and Phrases, vol. 7, pp. 6096–6102; vol. 8, p. 7785.]

9. PUBLIC LANDS (§ 93*)—GRANT OF TIMBER RIGHTS TO RAILROAD COMPANY— CONSTRUCTION.

Under an act granting to a railroad company generally the right to take timber from adjacent public lands "for the construction and repair of its railway and telegraph lines," where the articles of incorporation of the company authorized it to construct a number of connecting lines, it had the right to take timber from lands adjacent to one line for use in the construction or repair of another.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 283; Dec. Dig. § 93.*]

10. PUBLIC LANDS (§ 93*)—GRANT OF TIMBER RIGHTS TO RAILROAD COMPANY— CONSTRUCTION.

Under a grant to a railroad company of the right to take timber from public lands adjacent "required for the construction and repair of its railway and telegraph line," any part of the timber cut which was not suitable for such use, and all waste or side cuts incident to the sawing of the logs used into the dimensions required, remains the property of the United States, and the company has no right therein, and, if used by it for other purposes or by its agents for their own benefit with its consent or to its profit, the company and such agents are jointly liable therefor.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 283; Dec. Dig. § 93.*]

11. PUBLIC LANDS (§ 93*)—GRANT OF TIMBER RIGHTS TO RAILROAD COMPANY— WASTE.

Evidence considered, and *held* insufficient to show that a railroad company in exercising the right granted by Congress to take timber from public lands required for the construction and repair of its road abused the privilege by causing the timber cut to be so manufactured as to leave an undue percentage of merchantable lumber not used for the purposes specified which was sold for the benefit of itself or its agents.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 93.*]·

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the United States against the Denver & Rio Grande Railroad Company and others. Hearing on the merits. Order of reference.

See, also, 124 Fed. 156, 59 C. C. A. 579.

Jno. H. Knaebel, M. C. Burch, and W. A. Norton, for complainants.
J. F. Vaile and E. N. Clark, for Denver & R. G. R. Co. and Greenlaw.
Horace N. Hawkins, for Rio Grande, P. & N. R. Co., Pagosa Lumber Co., and Sullenberger. ·
C. C. Dawson, for Rio Grande & P. S. R. Co., New Mexico Lumber Co., and Biggs.
B. W. Ritter, for T. C. Graden and Graden Mercantile Co.
Richard McCloud, for Savage.

LEWIS, District Judge. In 1870 the Denver and Rio Grande Railway Company was organized under the laws of the Territory of Colorado. Its purpose, as shown by its articles of incorporation, was to locate, construct and operate railways and telegraph lines along the routes described in a general way in its articles of association; said lines being eight in number and designated as, 1, The Denver and Rio Grande Railway, 2, The Denver and Southern Railway, 3, The South Park Railway, 4, The Western Colorado Railway, 5, The Merino Valley Railway, 6, The San Juan Railway, 7, The Gallisteo Railway and 8, The Santa Rita Railway.

By act approved June 8, 1872, the congress granted to said company a right of way two hundred feet wide over the public domain, "together with such public lands adjacent thereto as may be needed for depot, shops and other buildings for railroad purposes, and for yard room and sidetracks, not exceeding twenty acres at any one station, * * * and the right to take from the public lands adjacent thereto stone, timber, earth, water and other material required for the construction and repair of its railway and telegraph lines * * * Provided, that said company shall complete its railway to a point on the Rio Grande as far south as Santa Fe within five years after the passage of this act, and shall complete fifty miles additional south of said point in each year thereafter, and in default thereof the rights and privileges herein granted shall be rendered null and void so far as respects the unfinished portion of said road." (17 Stat. 339.)

By act of March 3, 1877 (19 Stat. 405), the time limit in the above act was extended to ten years; and the ten years expired June 8, 1882.

The railway company had constructed and was operating many miles of its system prior to June 8th, 1882, and thereafter greatly extended some of its lines. It claimed the benefit of the congressional grant on all mileage completed on said date.

The Railway Company was succeeded by The Denver and Rio Grande Railroad Company shortly after the organization of the latter company in July, 1886, and it immediately acquired all of the property, rights and franchises of the Railway Company and has

claimed, and been adjudicated to be entitled to, the benefits of said congressional grant as the successor of said Railway Company.

On December 1st, 1902, the complainants exhibited their bill against defendant, the railroad company and its co-defendants, wherein it is charged that the defendants were then taking, and for several years theretofore had been taking, from public lands in southwestern Colorado large amounts of standing trees which were sawed up into great quantities of merchantable lumber of all kinds by some of the defendants at their mills, and being so manufactured into lumber were used in part by the defendant railroad company for repair purposes on its lines of railway, and in part for construction purposes on lines extended after June 8th, 1882, and that other parts of lumber so manufactured from said trees was converted by the other defendants to their individual use and profit with the knowledge, consent and acquiescence of the railroad company. The bill further alleges that the defendant's San Juan Railway was the nearest of its lines mentioned in the articles of incorporation of the original railway company to the locality from which said trees belonging to complainants were taken. It further charged that said timber was devoted to repair purposes on defendant's lines, other than the San Juan Railway, far remote from the section of country from which it had been originally taken; that its lines of railway were originally constructed as narrow gauge roads and that a large part of the timber had been taken for use in converting its line from narrow to broad gauge. That the other defendants went upon the public lands and took said timber and trees at the direction of, and as the agents and representatives of, the railroad company, under the claim made by it that it had the right to do so under the congressional grant. It charged that the congressional grant, according to its true intent and meaning, did not give the railroad company the right to take timber from adjacent public lands for construction purposes on any of that part of its lines built or extended after June 8th, 1882, nor for the purpose of converting a narrow gauge to a broad gauge road, nor for repairs of its lines at remote points, nor for repairs on any of its lines except the one to which the lands from which the timber was taken were adjacent. It charged that none of the timber was taken from lands adjacent to any of the defendant's lines, but from lands lying far remote therefrom. It further charged that the Rio Grande, Pagosa and Northern Railroad Company and the Rio Grande and Pagosa Springs Railroad Company were built and operated, under the direction and control of their managers, the defendants Sullenberger and Biggs respectively, for the purpose of reaching sawmills, which said two individuals respectively controlled and operated as managers, with the intent of transporting from said mills to the Rio Grande Railroad lumber made from trees taken from public lands far remote from the line of the Rio Grande road, and that such lumber was so transported. The bill charges in great detail an abuse of the rights and license claimed by the railroad company under the act of June 8th, 1872, and a wanton and reckless commission of waste in taking timber from complainants'

lands, and that it threatens to continue therein, and thereby a great destruction of the value of complainants' estate in said lands will result.

The separate answer of the Denver and Rio Grande Railroad Company admitted that it had taken timber from public lands in the territory described in the complaint, that it had appointed its co-defendants, except the two railroad companies, its agents for the purpose of cutting timber from public lands, that it had authorized its said agents to cut timber on public lands and to prepare the same at their mills under orders given for that purpose, and to manufacture for it, out of said timber, ties, telegraph poles and other timber of such dimensions as was needed by it in the repair of its lines of railroad, that it had used the same on its lines of railroad constructed prior to June 8th, 1882, at various points, some of them remote from the place of taking, for repair purposes. It alleged that all of such timber so taken by its agents was taken from public lands of complainants lying adjacent to the line of its San Juan Railway, and it justified all of its acts in that regard as having been done under said congressional grant. It alleges that it changed extensive portions of its railway system from narrow to broad gauge many years prior to 1900, and that for many years such parts have been used as standard guage railway lines, that the ties first used in construction of, and afterwards for repair of, its narrow gauge road were not adequately adapted to support a standard gauge track, that it first began standard gauge construction in 1881 and that it now has more than three hundred miles of standard gauge railway track, a part thereof being on lines constructed before June 8th, 1882, and a part thereof since that date. It denies that the two railroads of its two co-defendant railroad companies were constructed principally for the purpose of hauling out or carrying timber taken from the public domain and alleges such to be a small part of the business done by said roads, that they transport much lumber taken from private lands and also carry on a general transportation business and that they are common carriers for hire. It admits that it receives over said two roads from mills situated on or near them some timber manufactured from trees taken from public lands for repair purposes on its lines of road.

The answer denies all charges made in the bill against the defendants of acts of waste of timber taken from public lands and charges that it, through its agents, felled and took from public lands only such logs as were suitable for the immediate needs of the defendant, and that it and its agents at all times exercised the right and license granted it under the congressional grant in a fair and impartial manner, economically and prudently and without waste, it admits that it was its duty economically and without waste to select and take only such timber as was reasonably adapted to its use and within the limitations as to use fixed by said statute and for its own purposes only, and alleges that upon the reasonable exercise of such right the timber so taken from the public lands from time to time upon the taking thereof ceased to be the property of complainants. It alleges that it and its agents acting for it at all times acted in good faith in exercising the

right given by the act of congress, and at no time took any timber from the public lands which it did not believe to be adjacent to its lines of railway as authorized under said act. It makes reference to suits brought against it in the territorial court of New Mexico and in the federal court for the District of Colorado in which the construction of the act of June 8, 1872, was involved, and particularly the question as to the meaning of "adjacent" as used in that act, and alleges that it has attempted to conform to the construction of said act as given by the courts; it alleges that it, through co-defendants' officers and agents, has kept full and accurate records of the timber felled on the public lands from time to time and has given full information thereof, on request, to the proper officers of the complainants, although it alleges that it was not required to keep such record nor was the keeping of such record ever demanded or required of it. That through its officers and agents it has kept records and accounts of the manufactured products ordered by this defendant to be obtained from timber taken from the public lands and that it has at all times given to the accredited officers of the United States full information, upon request, of such records and accounts; that it has never at any time refused to give such information; but it alleges that such records were kept by it voluntarily and for its own purposes. It alleges that it had the right to give orders and directions to its co-defendants, who acted as its agents, to cut timber from public lands and to manufacture at divers mills railroad ties, bridge timbers and other railroad timbers and lumber of kinds, qualities, quantities, forms and dimensions needed by it and specified by it in its written directions to its agents, and alleges that it has at all times rigidly and carefully insisted that its agents should take only such timber from the public lands as was necessary for its purposes and as shown in its specific orders, and that they should not commit any waste or cut or destroy or take away any timber not required for such purposes; and that said its agents have at all times agreed that they would not commit any waste on the public lands nor cut or carry away any timber therefrom except for the sole purpose of supplying the railroad company with timber required by it for construction and repair of its railway lines. It alleges that some trees, after being taken by its agents to the mill, were found to be defective so that they were not suitable for railroad purposes and that its agents have from time to time converted such material into laths or other merchantable material and have disposed of the same upon the public market, but that such acts have not invaded or disregarded any rights of the complainants; that certain valuable surplus of slabs and boards, in the trimming of the timbers at the mills for the use of the railroad company, necessarily results; that such side cuts, slabs and surplus material is not the property of the complainants; that its agents have converted a part of such side cuts or surplus into merchantable material and disposed of the same for their use, but that such practice has at all times been well known to the complainants' agents who have from time to time examined the operation of said mills and have never complained against such methods.

It alleges that all of the timber taken by it from public lands were from lands within a reasonable wagon hauling distance of its railway line, and that none of the timber was obtained at a greater distance than fifteen miles from its line. That it has at all times signified its willingness to comply with any reasonable regulations of the Department of the Interior with reference to the taking of timber from public lands not inconsistent with the grant made by the act of June 8, 1872; that from time to time controversies have arisen between the complainants and the defendant in regard to its right to take such timber, but no definite rules and regulations have ever been made covering the subject matter by complainants' officers. Defendant further alleges that all of the timber mentioned in the bill of complaint, and for which an accounting is asked against it, was taken within the distance from the line of its San Juan Railway held by the adjudicated cases above referred to, as being within the meaning of the term "adjacent" in said congressional grant. It admits that it took some timber from complainants' public lands for construction purposes under the act of March 3, 1875, c. 152, 18 Stat. 482 (U. S. Comp. St. 1901, p. 1568), but alleges that it has a right so to do, and that it at all times complied with the regulations of the Department of the Interior or of the Commissioner of the General Land Office with reference to such taking. It asserts its willingness to make full showing of all its transactions in connection with the taking of timber from public lands, asserts that all its acts in that regard were done openly and in the utmost good faith and under the belief that it had a right to take the timber mentioned in the bill under said grant.

The Rio Grande, Pagosa and Northern Railroad Company, The Pagosa Lumber Company and Alexander T. Sullenberger answered jointly. This answer admits that said railroad company is a corporation and has existed as such since the latter part of the year 1900, and is operating a railroad between Pagosa Junction, which is the point of connection with the Rio Grande Railroad, and Pagosa Springs, but denies that its principal business has been or is the carrying of logs cut from public lands or the lumber made therefrom, but asserts that this is but a small part of its business. It admits that the defendant Sullenberger is president and general manager of said railroad company and that he is also the president and general manager of the Pagosa Lumber Company, a corporation, and that both of said companies are immediately under his general control and management. It admits that said lumber company operates two sawmills, but denies that all or any considerable part of the lumber manufactured by said mills is derived from the public lands of the United States, but avers that the principal produce of said mills is derived from timber cut from private lands. It admits that the lumber company has taken some timber from public lands as agent of the Denver and Rio Grande Railroad Company and claims that such taking for the Rio Grande Company was under the authority of congressional acts. That the lumber company in that respect acted by virtue of an appointment in writing made by the Denver and Rio Grande Railroad Company, whereby said lum-

ber company was constituted the agent of said railroad company to take such timber and that in such taking it at all times acted within both the letter and spirit of the congressional grant. That it carefully and economically cut from the public domain only such timber as was suitable and proper for the purposes for which it was ordered by the railroad company, that in reducing said timber to the sizes called for by the orders given by the railroad company there has always been a certain amount of inevitable waste, that it has caused such waste to be reduced to the least possible amount and that it used and disposed of such waste to its own benefit. Admits that in the slabbing and sawing of the logs derived from the public lands in filling the orders of the Denver and Rio Grande Railroad Company, in the course of shaping said logs into the forms and dimensions specified in the directions of the Rio Grande Company, there resulted in every case a considerable surplus or waste that could be and was adapted by the Pagosa Lumber Company, by trimming and sawing, into divers forms of lumber which was disposed of by the lumber company lucratively for the use and benefit of said lumber company, and that if such waste had not been so utilized and disposed of it would have been lost and destroyed and have been of no use or benefit to any person whomsoever. Admits that in the course of the felling of trees and the manufacture therefrom of standard gauge ties, bridge timbers, and other lumber for the Rio Grande Company there has resulted a considerable surplus of lumber which can be made into commercial lumber and which cannot be used in filling the orders of the Denver and Rio Grande Railroad Company, and the three said defendants admit that they have used such excess of lumber for their own private purposes, and that such excess has been intermingled with the private stocks of lumber of the said Pagosa Lumber Company as collected from time to time at its mills, and that the same has been used for commercial and lucrative purposes by the said Pagosa Lumber Company; but it avers that said excess lumber would have been wholly wasted had it not been so used. Avers that in all respects the taking of such timber from public lands has been in strict accord with the authority conferred by the Denver and Rio Grande Railroad Company under the acts of congress; that they have strictly and carefully followed the directions in that regard of the Denver and Rio Grande Railroad Company, and have delivered the manufactured product from the timber so taken to the Denver and Rio Grande Railroad Company, except said surplus or inevitable waste.

The answer denies that the complainants are interested in or concerned in the said excess or waste, denies that the Pagosa Lumber Company in converting the same to its own use and benefit worked any wrong or injury to the complainants, and denies that any of said timber was taken from public lands which were not adjacent to the line of the Denver and Rio Grande Railroad Company.

The answer alleges that the Rio Grande, Pagosa and Northern Railroad Company in due time pursued and complied with the matters and things provided for by the act of congress of March 3, 1875 (18 Stat. 482), and that it took timber from public lands of the United States

lying adjacent to its line of railroad for the construction of said road, that, with the exception of such timber as has been used by it in the construction of its said railroad, neither it nor Sullenberger nor the Pagosa Lumber Company has taken, or caused to be cut or taken, from the public domain of the United States any timber of any kind or character for any purpose or purposes whatsoever, save and except such timber as has been cut by these defendants under the power and authority conferred upon them by the Denver and Rio Grande Railroad Company acting by, through and under the authority conferred upon it by the acts of congress in the bill of complaint set forth.

The Rio Grande and Pagosa Springs Railroad Company, The New Mexico Lumber Company and E. M. Biggs filed joint answer. It admits that the Rio Grande and Pagosa Springs Railroad Company is a corporation organized and existing under the laws of the State of Colorado, and has been, and is, operating a railroad as averred in the bill, but it denies that its principal business consists, or has consisted, in carrying logs cut on or from the public domain to the sawmill of the New Mexico Lumber Company, or in carrying and delivering to the Denver and Rio Grande Railroad Company telegraph poles cut on the public domain, or large quantities of lumber manufactured at said mill from logs cut on the public domain. It avers that but a small part of its business consists in hauling logs and lumber products of timber cut from the public domain, admits that it does handle some logs and some lumber cut and manufactured from such timber. Admits that the New Mexico Lumber Company is a corporation organized under the laws of Colorado, and that the defendant Biggs is president and general manager of both said railroad company and lumber company and that both of said companies are under his immediate control and management; but denies that any considerable part of the lumber manufactured at said mills is derived from timber taken from the public lands of the United States, but avers that the principal product of said mills is derived from timber cut from private lands.

Said answer then contains substantially the same allegations as found in the answer of Sullenberger and others above noted in reference to the written authorization given to the lumber company by the Denver and Rio Grande Railroad Company for cutting and taking timber from public lands for the use and benefit of said last named company, the manufacture of the same at the mills of the New Mexico Lumber Company for said railroad company and the use by it of the excess waste or surplus resulting in such manufacture. It also alleges that the Rio Grande and Pagosa Springs Railroad Company took timber from lands adjacent to its line for construction purposes under the act of congress of March 3, 1875, and that it took no other timber from public lands except as the agent of the Denver and Rio Grande Railroad Company under the grant and license to said latter company given by congressional acts.

The Graden Mercantile Company and Thomas C. Graden filed a joint answer. It admits that the Graden Mercantile Company is a corporation under the laws of the State of Colorado, admits that Thomas C. Braden, is, and has been, the president of said Graden

Mercantile Company and that he has had direct management and control of said company, that in the year 1900 and since that time the Graden Mercantile Company has been engaged in the lumber business and has two mills of the daily capacity respectively of twenty thousand feet and twenty-five thousand feet board measure, that one of said mills is situate about twelve miles easterly from Durango and within four miles of the San Juan Railway and the other about twenty-three miles easterly from Durango and within ten miles of the San Juan Railway, but that said mills have not been constantly operated. Admits that the Graden Mercantile Company, acting for and on behalf of the Denver and Rio Grande Railroad Company, and as its agent, and not otherwise, cut and removed timber from certain of the public domain of the complainants, to wit, parts of sections 3 and 4, Township 34, North, Range 6 West, and parts of sections 33, 34, 35, Township 35, North, Range 6 West, to the aggregate amount of 528,-960 feet and no more, and manufactured the same at one of its mills, that said timber was taken from lands not further distant from the line of the San Juan Railway than twelve miles, that said lands from which said timber was taken were adjacent to the line of said San Juan Railway within the meaning of the act of congress, and was within reasonable and easy hauling distance of said line of railway. That the other mill of said Graden Mercantile Company has been chiefly engaged in manufacturing lumber from timber cut from private lands and not belonging to complainants; but that, acting as the agent of the Denver and Rio Grande Railroad Company, and in its behalf, it has felled, cut, manufactured and delivered to said railroad company trees, logs and timber from certain of the public domain of the complainants, to wit, parts of sections 25, 26, 27, 28, 33, 34 and 35, in Township 35, North, Range 8 West, to the aggregate amount of 1,868,339 feet and no more, and that no other logs or timber taken from public lands were manufactured at said mill; that said trees and logs taken from public lands and manufactured at said mill as aforesaid were taken from lands not further distant from the line of said San Juan Railway than five miles, and were within reasonable and easy hauling distance from such line of railway and adjacent thereto, within the meaning of the acts of congress. That in the taking of said timber from the public lands the Graden Mercantile Company acted under and by virtue of a written appointment and authority from the Denver and Rio Grande Railroad Company, and that all of the timber so manufactured at its mills was delivered to the Denver and Rio Grande Railroad Company for its use in the construction and repair of its said railroad line; and for use in the construction and repair of those portions of its said line which had been completed prior to June 8th, 1882, and that said timber was taken, as it verily believed, for the purposes and as authorized by the congressional acts of 1872 and 1875. That the Mercantile Company at all times acted in the utmost good faith and with the greatest possible care and precaution to prevent any unnecessary or unavoidable waste or loss of any timber, trees or lumber; that it took no such trees or timber for its own use or benefit, nor for any purpose except to pro-

vide the defendant railroad company with the lumber so by it directed to be procured for the purposes and under the authority aforesaid; that the total amount of timber so taken by it was 2,397,299 feet and no more; and that the Gradèn Mercantile Company manufactured lumber from logs and timber bought by it from private persons not taken or procured from lands belonging to complainants or from any portion of the public domain of the United States. That such care and prudence was exercised by the Graden Company that very little of such timber was lost or wasted by reason of any defect or decay therein, or otherwise, and a very small proportion was lost or wasted in the preparation and manufacture of any such lumber, that all and every such loss or waste or shrinkage in such timber, whether by reason of defects in the timber itself or by reason of the portions necessarily cut therefrom in the manufacture thereof, was made good by the Graden Company by supplying to the Denver and Rio Grande Railroad Company other lumber manufactured from timber belonging to the Graden Company and not taken from lands belonging to complainants. That the Graden Company in felling and taking timber from the public lands for the Denver and Rio Grande Railroad Company took the same only from lands adjacent to its line of railway and adjacent to a line constructed prior to June 8th, 1882, that it at all times acted in the utmost good faith and within the limitations expressed and implied in the acts of congress. That the timber so cut and taken by these defendants did not, and does not, exceed in any case, in value one dollar and fifty cents ($1.50) per thousand. This answer also refers to the adjudications construing the acts of 1872 and 1875 and alleges that all the timber taken by these defendants was within the terms of said act and the construction put upon the same by the courts. Admits that in manufacturing such timber there necessarily occurs some surplus of slabs or pieces of some value which are not fitted for railway repair or construction, but that on account of the care and caution exercised by the Graden Company such surplus was very small and that none thereof was converted by the defendant to its own use or confused or intermingled with its own lumber where such side cut was of such dimensions and quality as was suited to such railway uses and purposes.

The defendant E. F. Greenlaw filed a separate answer. He admits that he was maintaining and operating a sawmill at the time the bill was filed, located within ten miles of Ignacio, a station on the San Juan Railway, and that he manufactured lumber from logs cut on complainants' public lands, and that said lumber was delivered to the Denver and Rio Grande Railroad Company; that he bought the mill from other parties and sawed up some logs then at the mill at the time of his purchase which he believes came from section 28, Township 35, Range 6 West; that thereafter he was duly appointed in writing by the Denver and Rio Grande Railroad Company as its agent to enter upon public lands of the United States adjacent to its railway lines for the purpose of obtaining therefrom timber for the use of said railroad company; that he received orders from said company to manufacture lumber for it to the amount of 55,000 feet, and that

for that purpose he cut logs reasonably sufficient to fill said order on section 27, in Township 35, Range 6 West, in the County of La Plata, and that he proceeded to execute said order to the extent of about 20,-000 feet and was then ordered by a special agent of the Land Office not to saw any more lumber for the railroad company under the terms of his agency appointment, and he thereupon ceased to do so. That the greater part of the logs sawed at his mill came from lands owned by private persons, less than two per cent thereof coming from public lands of the United States. That he has taken no timber from lands of the United States other than from the two sections mentioned, and acted then only as the agent of the railroad company and in good faith, believing said railroad company had a right to take said timber; that as the agent of the railroad company he kept exact memoranda and data by which he is able to know and to show the quantity of timber so cut by him and the localities from which the same were derived; that he exercised such care in sawing the logs that very little waste resulted, which small amount of waste and surplus he devoted to private uses or sale, and that the timber taken by him from said two sections was on lands adjacent to said line of railway and within reasonable wagon hauling distance thereof, to wit, the San Juan Railway.

The defendant J. W. Savage filed a separate answer. He admits that he was operating a sawmill for the manufacture of lumber, and alleges that the same was situate within six miles of that part of the Denver and Rio Grande Railroad line constructed prior to June 8th, 1882. He denies that he has cut or taken any logs or timber upon the public lands of the complainants, but, on the contrary, alleges that all of the timber so cut or taken by him was taken from private lands in which the complainants have no interest whatever.

The defendant Denver and Rio Grande Railroad Company filed an amendment to its answer. In this amendment it denies that any standard gauge railroad ties, or bridge timbers, or other timber or lumber adapted to use on standard gauge railway, were used by the defendant for the purpose of remodeling or reconstructing its narrow gauge railroads into standard gauge railroads, or to converting into standard gauge railroads its narrow gauge railroads which had been constructed or completed before the 8th day of June, 1882, or other narrow gauge railroad constructed after that date; but alleges that as to the portion of its line constructed prior to June 8th, 1882, it has since the original construction thereof taken timber from public lands and used the same only for the purpose of repair of said railway line. That for the purposes of necessary repair it has caused certain of said timber to be manufactured into sizes and lengths adapted to standard gauge railway and asserts the right to do this under the acts of congress. That as to the portion of its lines constructed subsequent to June 8th, 1882, it alleges that it has used timber from public lands only for purposes of original new construction, which it asserts it had the right to do under the act of March 3, 1875, and any timber taken for that purpose has been in accordance with the provisions of said act, and that as to lines constructed since June 8th, 1882, it did not take

or use timber from public lands for any purposes of repair or remodeling or reconstruction whatever.

On January 8th, 1904, the complainants filed their petition asking leave to amend the bill of complaint, with the proposed amendments attached thereto. This petition was not presented to the Court for action thereon until more than two years after the same had been filed and after a great deal of testimony had been taken in the case. The right to amend was opposed by the defendants. Arguments were heard upon the petition and briefs filed, but no action was then taken by the Court on said petition, the Court announcing that leave to amend the bill would not be passed on by the Court unless it appeared on final hearing that each party had had ample opportunity to adduce proof on the new matter to be brought into the bill by the proposed amendment. It now appears that such proof has been introduced by all the parties and the new issues raised by the proposed amendments have been elaborately argued by respective counsel in their final briefs. It will therefore be ordered that complainants may amend their bill as prayed in their petition. Said amendments will be taken as denied in the several answers, unless the defendants ask leave to plead thereto otherwise. The proposed amendment introduces into the suit two alleged vital elements, viz.:

1. That the line of the San Juan Railway as constructed, which was alleged in the bill to be the line contemplated in the original articles of incorporation of the Denver and Rio Grande Railway Company, is not, under the facts adduced in evidence, the true line of the San Juan Railway. That the true line was a line that the defendant partly constructed, but never completed, beginning at Chamita, in New Mexico, and extending northerly up the valley of the Big Chama River, whereas the line of the San Juan Railway as completed begins at Antonito, in the State of Colorado, at a point far north of Chamita and runs from Antonito in a general westerly direction; and

2. That a written contract entered into between the Denver and Rio Grande Railway Company, The Union Pacific Railway Company, The Atchison, Topeka and Santa Fé Railroad Company, The New Mexico and Southern Pacific Railroad Company and The Pueblo and Arkansas Valley Railroad Company, in which it was agreed that the Denver and Rio Grande Company would not further extend its lines into certain sections of the Territory of New Mexico as contemplated by its articles of incorporation, operated as a repudiation by the Rio Grande Company, and thereby a loss, of all of its rights from that date granted by the act of June 8, 1872. These matters will be considered later.

The bill prayed for an injunction against the further taking of complainants' timber and for an accounting for that which had been taken and judgment for the value thereof. The temporary writ issued, and among its other prohibitions restrained the defendants from taking any timber from beyond three miles of its right of way on either side of the road. From this order an appeal was taken. The court of appeals lifted some of the restrictions in the temporary order and

modified others. 124 Fed. 156, 59 C. C. A. 579. With these changes the temporary writ has since stood.

Proofs have been taken, consisting of about four thousand type-written pages, and a large number of exhibits comprising many hundred pages more. Oral arguments have been had, written briefs filed and the issues submitted for final determination.

It was suggested at the oral argument, and again in the briefs, that the record was so extensive and the testimony of witnesses so contradictory as to the physical facts disclosed upon the ground which had to do with the measurement of stumpage for the purpose of ascertaining the amount of timber that had been taken from concededly public lands; that there was such positive and direct contradiction between witnesses as to whether some of the public lands from which complainants claim timber was taken, ever at any time had any timber growing on it; that there was such a wide difference between witnesses for complainants on the one hand and for defendants upon the other as to the amount of timber which has been taken from complainants' lands as ascertained from the stumpage; and that so much clerical and accounting work would have to be done by way of deducting from the gross measurements reported by complainants' witnesses stumpage unquestionably included therein but found afterward to be on many tracts of privately owned land, that the Court would need the services of an accountant to examine the record and make report in condensed form, (1) of the amount of timber actually taken which belonged to complainants, (2) the sub-divisions from which such timber was taken and the distance thereof from a line of the defendant's railroad, (3) the amount thereof taken from lands adjacent to such line within the meaning of the act of June 8, 1872, and used by the defendant Denver and Rio Grande Railroad Company and for what purposes used, (4) the amount thereof, if any, converted to the private use and benefit of the other defendants with the permission or acquiescence of the railroad company, (5) the amount, if any, taken from lands not adjacent to a railroad line and by which of the defendants, and (6) the amount, if any, taken by others than any of these defendants or by other agents of the railroad company other than the defendants here sued. The arguments on the hearing, the briefs and such examination of the record as time will permit, convinces that this ought to be done.

It is earnestly insisted by the defendants that the government's cruising party, said to be composed of twenty or thirty men who were sent into the field to measure the stumpage and spent about two summers in that work, measured up stumpage indiscriminately throughout that entire section of country, including that found on both public and private lands, and that the stumpage so measured on lands privately owned enters into and is a part of the ninety-six million feet which was claimed by complainants, but which their counsel now say should be reduced by some fifteen or twenty million feet. It is evident that this insistence is not lightly made, and a careful examination of the record must be made for the purpose of ascertaining the true facts in that particular.

The defendants also sent a cruising party into the field and made

measurements of stumpage and they insist that their measurements do not disclose more than one-third as much timber taken from public lands over the territory in question as that claimed by the complainants, and that complainants' cruisers greatly swelled their estimates of the true amount of timber that had been taken from particular sections of public lands by measuring the stumpage on a small part of any one section which they believed to be a fair stumpage for the entire tract and on such measurement making their estimate for the entire tract; that this was found to be wholly misleading because in measuring the different sections the only manner in which the true stumpage could be arrived at was to take the smallest subdivision of each tract and make measurements and estimates only thereon, as they claim their cruisers did. It is also claimed by the defendants that complainants' cruisers measured and carried into their estimates stumpage on either side of the line of the San Juan Railway and within its two hundred foot right of way, and they insist that any timber standing on said right of way became, by ownership of the right of way, the property of the railroad company in which the complainants had no interest and for which they can in no event recover the value thereof.

The results of these measurements, by each side, were put down in small blank books carried at the time. There are a great number of them and they have been filed as a part of the evidence in the case and must be examined. It will also be necessary to eliminate the measurements ascertained from stumpage of timber taken, if any, by the Rio Grande, Pagosa and Northern Railroad Company and the Rio Grande and Pagosa Springs Railroad Company, each of which availed itself of the right to take timber for construction purposes under the act of March 3, 1875. I shall hereinafter state the other matters which will need to be examined into and reported by the special master, if appointed.

It is important to first ascertain and determine the rights of the parties. In order to do so the following questions must be considered and answered, and their true answers on being applied to the facts will determine, as I conceive, the whole controversy. The questions are these, viz:

1. Is the case as made by the bill and answers one of equitable cognizance?

2. Did the contract entered into by the Denver and Rio Grande Railway Company with the Santa Fé Railroad Company and the three other railroad companies on March 27th, 1880, whereby the first named company agreed not to extend its lines further into certain territory, operate as a surrender, as of the date of said contract, of all of its rights, from and after that date, given by the congressional act of June 8th, 1872?

3. Is the San Juan Railway constructed from Antonito, a point on one of its other lines, westerly over the continental divide to the valley of the Las Animas River and thence northerly up said valley and completed to a point north of Durango prior to June 8th, 1882, and ever since operated, and being the only line that it ever completed through that territory, a line entitled to the benefit of the grant given

by the act of June 8, 1872? Or is the roadbed some forty miles in length, but on which no track was ever laid and no railroad in any manner ever operated over the same, which it constructed at an early date from Chamita, near the junction of the Big Chama River with the Rio Grande Del Norte, northward and up said Big Chama River, the San Juan Railway as contemplated by the original articles of incorporation of the Denver and Rio Grande Railway Company?

4. Does the fact that a large part of the lands from which the timber in controversy was taken was within and a part of the Ute Indian Reservation at the time the act of June 8, 1872, was passed, operate to exclude them as not being lands contemplated by said act?

5. Do the adjudicated cases between the complainants and the Denver and Rio Grande Railway Company and Railroad Company, referred to in the bill, construing the act of June 8, 1872, together with the conduct of the complainants' agents who visited, from time to time, the mills at which the timber in question was being sawed, knew the locality and public lands from which it was taken and the manner in which it was being manufactured and their failure to object thereto, operate as an estoppel against complainants to make the claim for an accounting as sought in the bill?

6. "Were the lands from which the defendants took and were taking the timber, adjacent to the right of way of the Denver and Rio Grande Railway Company?

7. "Had the railroad company the right to take timber from government lands adjacent to its right of way to make the narrow gauge railroad which was built prior to June 8th, 1882, over into a broad gauge railroad, or to repair broad gauge railroad after such a change had been made?

8. "Had the railroad company the right to take timber from lands adjacent to one of the lines of railway numbered and specified in the original grant of its franchise to its predecessor, and use this timber to repair another of those lines?

9. "Had the railroad company or its agents the right to the surplus lumber arising from logs found inapplicable, on account of rot or other latent defects, to the uses of the railroad company, after they arrived at the mills, and from the side cuts of the logs that were used for railroad purposes?

10. "Conceding that the railroad company had the right to take timber from lands adjacent to its right of way for the purposes for which it was obtaining the timber in controversy, that the lands from which it was removing this timber were adjacent, and that the railroad company was entitled to the surplus lumber after extracting from the logs the timber it needed, was it abusing this right, wasting the timber, and recklessly and designedly creating an unnecessary excess for its own benefit or that of its agents, to the manifest injury of the government?"

Questions 2 and 3 above noted are brought into the case by amendments to the bill. Question 4 appears not to have been suggested until after much of the testimony had been taken and again on final argument. Questions 6, 7, 8, 9 and 10 were first propounded in this

case by the court of appeals (124 Fed. 159, 59 C. C. A. 579), and that court said of the first four thereof "These questions are grave and difficult. They must in any event be considered and decided at the final hearing of the case."

They will be considered in the order above given.

[1] As to question 1,—This question must be answered in the affirmative. Preteca et al. v. Maxwell Land Grant Co., 50 Fed. 674, 676, 1 C. C. A. 607; Oolagah Coal Co. v. McCaleb et al., 68 Fed. 86, 15 C. C. A. 270; United States Freehold Land & Em. Co. v. Gallegos, 89 Fed. 769, 32 C. C. A. 470; Dimick v. Shaw, 94 Fed. 266, 36 C. C. A. 347;

Pomeroy's Equity Jurisprudence, Vol. 1, § 237:

"Equity therefore assumed a jurisdiction to grant an injunction restraining the commission of actual or threatened waste; and having obtained jurisdiction for the purpose of awarding this special relief, which, in many instances, is not complete, the court will retain the cause, and decree full and final relief, including damages."

Daniell's Chancery P. & P., Vol. 3, p. 1732: ·

"The inadequacy of the remedy at common law, as well to prevent as to give redress for waste, is so unquestionable, that a resort to the courts of law, for either of those purposes, has in a great measure fallen into disuse. The remedy by a bill in equity is much more easy, expeditious and complete."

And page 1737: · ·

"The court will likewise interfere by injunction, where the parties committing the waste, with nothing but temporary and limited interests in the subject matter, are maliciously and wantonly abusing their legal rights to the injury of those in remainder; this is commonly called equitable waste, which may be defined to be the commission of such acts as at law would not be esteemed, under the circumstances of the case, to be waste, but which are so esteemed in the view of a court of equity, from their manifest injury to the inheritance, though not inconsistent with the legal rights of the party committing them."

And page 1739:

"It is to be remarked, that the object of the Court's interference in granting an injunction to stay this kind of waste (equitable) is not by way of satisfying a damage, but in order to prevent a wrong, and, therefore, a person cannot come into equity merely for an account, unless where the waste is of that nature that the plaintiff has no remedy at law; the account depends entirely upon the injunction; it is incidental to and consequential upon it; and, if a person is entitled to the one, he is entitled to the other also, on the principle of preventing a multiplicity of suits."

It is alleged in the bill that the Denver and Rio Grande Railroad Company claimed the right to send its agents, the other defendants, upon the public lands in question and take timber under the license given it by the act of June 8, 1872, but that it was abusing that privilege and wantonly committing waste in taking complainants' timber therefrom, and that it threatens to continue such practices.

United States v. Bitter Root Co., 200 U. S. 451, 26 Sup. Ct. 318, 50 L. Ed. 550, is not to the point.

[2] As to question 2,—The proviso in the act of June 8, 1872, is as follows:

"Provided, That said company shall complete its railway to a point on the Rio Grande as far south as Santa Fé within five years of the passage of

this act. and shall complete fifty miles additional south of said point in each year thereafter. and in default thereof, the rights and privileges herein granted shall be rendered null and void so far as respects the unfinished portion of said. road."

The southerly point, as fixed in this proviso, was to be on the Rio Grande, and such point was required to be as far south as Santa Fé.

The amendatory act of March 3, 1877 (19 Stat. 405), changed this proviso so that it reads as follows:

"Provided. That said company shall complete its railway as far south as Santa Fé within ten years of the passage of this act and shall complete fifty miles additional south of said point in each year thereafter; and in default thereof the rights and privileges herein granted shall be rendered null and void as far as respects the unfinished portion of said road."

Under this amendment the Rio Grande was eliminated as the southerly point to be reached, and the time extended from five to ten years. It was only required that said southerly point should be as far south as Santa Fé; but the proviso further required the railway company "shall complete fifty miles additional south of said point in each year thereafter." Now the provision in the contract of March 27th, 1880, made by the Rio Grande Company with the Santa Fé Railroad Company and other railroad companies, which it is claimed operated as a surrender and forfeiture by the Rio Grande Company of all future rights under the act of June 8, 1872, reads as follows:

"And the party of the third part (The Denver and Rio Grande Railway Company) hereby agrees to and with the parties of the second part (The Atchison. Topeka and Santa Fé Railroad Company, The Pueblo and Arkansas Valley Railroad Company, The New Mexico and Southern Pacific Railroad Company), and with each of them, as long as the parties of the second part, and each of them. shall keep the agreements on their behalf herein contained, not directly or indirectly to construct or promote the construction of any railroad * * * in New Mexico south of the parallel of latitude seventy-five miles south of the village of Conejos in Colorado, * * * provided. nothing herein contained shall * * * prevent the construction of a line by the party of the third part through New Mexico for the purpose of reaching Arizona, provided such line shall not, in New Mexico, south of said last mentioned parallel of latitude. be located east of the 108th Meridian, or south of the parallel of latitude ninety miles south of the northerly boundary of New Mexico."

An examination of the map of New Mexico shows that Santa Fé is approximately ninety miles south of the northerly boundary of New Mexico. The Rio Grande Railway Company was therefore at liberty, notwithstanding the contract. to construct its line as far south as Santa Fé within ten years after June 8th, 1872, but if it kept the obligation of the contract that line would have been deflected westerly, from the point where it entered the territory from the north, across the northwest corner of New Mexico and into Arizona, in order to reach a point as far south as Santa Fé. This would have carried it far west of the valley of the Rio Grande, which valley would appear to be the most feasible and direct route for reaching El Paso in the State of Chihuahua. El Paso, in the State of Chihuahua, is named in the articles of incorporation as being the most southerly point to which it was proposed to construct the Rio Grande Railway. the first named line in its articles of incorporation. But conceding that

a feasible route to El Paso might have been found from the point in Arizona to which the contract permitted it to construct its road, it was, by the terms of said agreement, prohibited from thereafter reentering New Mexico with extensions of its line in order to reach El Paso. Nevertheless, extension to El Paso might have been made from the point in Arizona by extending into the Republic from Arizona and thence to El Paso. It would therefore appear that the contract did not prohibit the railway company from reaching El Paso, in the State of Chihuahua, as its most southerly terminus. The total effect of the contract in that regard was a prohibition against reaching that southerly terminus by building its line over New Mexican territory. But, even conceding that the deflection of its line far to the westward, under the requirements of the contract, would have rendered it impracticable to reach El Paso, it is not believed that the railway company's rights under the congressional grant would have been in any manner affected thereby. Congress fixed the penalty for failure to comply with the condition now being considered; and it did so without regard, so far as disclosed by the act, to the causes that might prevent construction southward; the latter part of the proviso reads:

"And in default thereof (failure to complete its railway as far south as Santa Fé within ten years of the passage of the act and fifty miles additional south in each year thereafter) the rights and privileges herein granted shall be rendered null and void so far as respects the unfinished portion of said road."

The cause of the failure to extend southward is not therefore believed to be a matter open for consideration under the terms of the act.

The second question will therefore be answered in the negative.

[3] As to question 3,—The railroad line nearest which the timber in question was cut extends from Antonito, a point in Colorado on the line designated in the railway company's articles of incorporation (1870) The Denver and Rio Grande Railway, westerly. It lies near to the dividing line between Colorado and New Mexico for many miles, being in part on one side and in part on the other, of that line. It reaches and crosses the San Juan valley. At a point on the Los Pinos River, a tributary to the San Juan, it takes a northwesterly course to Durango and thence northerly up the Las Animas River. Its construction was begun at Antonito in April, 1880, and it was completed into Durango during the summer of the next year. A map showing its definite location was received and filed by the Secretary of the Interior under the act of June 8, 1872. It has always been known and operated as the San Juan line. The route over which it was constructed conforms to the route designated in the original articles of incorporation as the San Juan Railway. The articles in that particular read thus:

"The San Juan Railway,—Commencing at a point on the said Denver and Rio Grande Railway near or accessible to the valley of the Chama, or such other western tributary of the Rio Grande as may be found most eligible, and to extend thence by such most eligible valley to the divide separating the waters of the Great Colorado from the Rio Grande, and thence to such point in the San Juan valley as may be most expedient."

Starting at Antonito this line runs westward up a tributary of the Rio Grande until it reaches the crest of the Chama Mountains, thence westward across the valley of the Big Chama River and over the continental divide, which separates the waters of the Great Colorado from those of the Rio Grande, thence down the tributaries of the Rio San Juan, thence down the San Juan valley and across it to the Los Pinos, a tributary of the San Juan, thence up the Los Pinos and on to Durango. This route complies literally with that given in said original articles of incorporation. But it is said that because the railway company constructed a forty mile roadbed up the Big Chama River from Chamita, a point on its main line far south of Antonito, which, if it had been continued, would have covered the same general section of country in Southwest Colorado as the line that was constructed, and inasmuch as the defendant has continued to pay taxes on said roadbed and claim it as its property, this should be considered the true San Juan Railway as contemplated by the original articles of incorporation. Chamita is in New Mexico far south of Antonito and on what may be called the main line, that is the one first designated in the articles of incorporation. It is referred to as the main line in Railway Co. v. Alling, 99 U. S. 463, 25 L. Ed. 438, and the other seven lines designated in the articles as feeders or branches. But this main line had not reached Chamita until a large amount of grading and track laying had been finished from Antonito westward. It was the undoubted intention of the railway company at that time to complete the line westward from Antonito as its San Juan line, and so designated in the articles of incorporation, and it has ever since adhered to and carried out that intention.

The answer to the third question therefore must be, that the defendant's line of railway from Antonito westward to and beyond Durango is its San Juan Railway, that it was completed to Durango and beyond prior to June 8, 1882, and was and is entitled to the benefit of the grant given by the act of June 8, 1872, and that the unused roadbed up the Big Chama from the main line at Chamita is not the San Juan Railway as contemplated in the original articles of incorporation.

[4] As to question 4,—When the act of June 8, 1872, was passed a large part, but not all, of the lands from which the timber in controversy was cut were within the Ute Indian Reservation. This reservation was created by treaty with the Utes and other Indians concluded March 2nd, 1868, and proclaimed November 6th of that year, and is found in 15 Stat. 619. Its eastern boundary was the 107th Meridian of Longitude, its southern boundary the southern boundary line of the Territory of Colorado, and its western boundary the west line of said Territory. The lands were "set apart for the absolute and undisturbed use and occupation of the Indians." The United States agreed that no person, except certain government officers, should be permitted to pass over, settle upon or reside in the territory described. Article 14 of the treaty provided:

"The said confederated bands agree that whensoever, in the opinion of the President of the United States, the public interests may require it that

all roads, highways and railroads authorized by law shall have the right of way through the reservation herein designated."

On May 12th, 1880, the President issued a proclamation declaring that public interests required the construction of defendant's railroad through said reservation (Complts. Ex. 8). The defendant's San Juan Railway line extends in part through the territory originally included in said reservation. On April 23rd, 1872, congress passed an act authorizing the Secretary of the Interior to make certain negotiations with said Indians for the extinguishment of their right to the south part of said reservation (17 Stat. 55, c. 115). The negotiations resulted in an agreement with the Indians, which agreement was ratified by congressional act April 29th, 1874. By this agreement the Utes relinquished to the United States all their right and interest in a strip fifteen miles wide lying immediately north of the southern boundary line of said reservation, except the right to hunt thereon (18 Stat. pt. 3, p. 36, c. 136). Thereafter, and in 1880, congress by act ratified an agreement with the Indians by which they released all of their rights in said reservation, but the act provided for allotments of lands within the bounds of said reservation in severalty to said Indians, designating the amount of land to each Indian for which patents might issue conveying the fee and prohibiting either voluntary or involuntary encumbrance or alienation until such time thereafter as the President might see fit to remove the restriction, (Act June 15, 1880, c. 223, 21 Stat. 199). These allotted tracts appear upon the maps offered in evidence under the designation "I. A." Complainants' counsel did not claim on oral argument nor in the brief that any of the cutting complained of had been done on these allotments, nor that the complainants would be entitled to the value of any timber cut thereon even if the proof showed such cutting. On the contrary, I understand the defendants to claim that there is no proof that there was any cutting on said allotments, and that, in fact, there was none. The defendants also made the claim, at oral argument and in briefs, that none of the cutting complained of was done until after the reservation had been vacated by act of June 15th, 1880. We now note that the sole contention of complainants' counsel, as we understand it, is that the lands on which much of the cutting was done being, at the time the act of June 8, 1872, was passed, within the Ute Reservation such lands cannot be considered "public lands" within the meaning of said act. The United States owned the fee in the land within the reservation. The Indians were given the right of occupancy and such use as they saw fit to make of it. The United States could convey the fee, subject to such rights as were given by the treaty, and make such use of them during the existence thereof as they saw fit, not inconsistent with the rights of the Indians. M., K. & T. Ry. Co. v. Roberts, 152 U. S. 114, 14 Sup. Ct. 496, 38 L. Ed. 377; Spalding v. Chandler, 160 U. S. 394, 403, 16 Sup. Ct. 360, 40 L. Ed. 469; Buttz v. N. P. R. R., 119 U. S. 55, 7 Sup. Ct. 100, 30 L. Ed. 330; Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440.

In United States v. Blendaur, 128 Fed. 910, at page 913, 63 C. C. A. 636, at page 639, it is said:

"The words 'public lands' are not always used in the same sense; their true meaning and effect are to be determined by the context in which they are used, and it is the duty of the Court not to give such a meaning to the words as should destroy the object and purpose of the law or lead to absurd results."

The Court then proceeds to approve the following found in United States v. Bisel, 8 Mont. 20, 19 Pac. 251:

"There is no statutory definition of the words 'public lands,' and the meaning of them may vary somewhat in different statutes passed for different purposes, and they should be given such meaning in each as comports with the intention of Congress in their use."

The treaty of 1868 expressly provided that railroads should have the right of way through the reservation if, in the opinion of the President, the public interests required. The Ute Reservation was a vast territory; it comprised a parallelogram in the southwestern part of the Territory extending approximately two hundred miles north and south and one hundred and twenty-five miles east and west. It was apparent to congress, from the original articles of incorporation of the railway company, that both its Western Colorado Railway and its San Juan Railway would cross the reservation. The two lines last referred to, and other lines designated in the original articles of incorporation, were projected entirely through a mountainous country in which railroad building is, of course, unusually expensive. It was then an undeveloped and frontier country. The population of the Territory was less than forty thousand in 1870. It would have been an almost impossible thing to have brought the materials needed by the railroad company, and named in the act, into the reservation from points beyond its borders. Lex non cogit ad impossibilia. It cannot be believed that congress, by the act, intended to withhold from the railway company the right to take from lands adjacent to its lines within said reservation stone, timber, earth, water and other material for the construction and repair of such lines. Under such conditions "public lands," as used in the act, must be construed to include lands within said reservation, and that the act gave the right to the railway company to take the materials named therefrom for the purposes expressed, and that such right was not in conflict with the rights given to the Indians under the treaty. Beside this, the right and license given under the act of 1872 were continuing. The reservation was vacated before the San Juan line had entered it, and none of the timber involved in this suit was taken until after such vacation. Further than this, by the act of April 29, 1874, it appears that the Indians relinquished a strip fifteen miles wide on the southern side of said reservation, which strip covers almost all of the lands theretofore lying within said reservation and from which timber was taken and here complained of. Before construction on the San Juan line had been begun congress, by act of March 3, 1877, amendatory of the act of June 8, 1872, confirmed said rights given by the earlier act.

Question 4 is therefore answered in the negative.

[5] As to question 5,—The railway company was given a mere privilege or license to take timber and other material from the public lands by the act of 1872. In exercising that license from time to time

it parted with no consideration and the complainants received nothing therefor. When the defendant, through its agents, cut the timber in question and took it from complainants' lands neither it nor they rendered anything of value to complainants. Their acts in that regard produced, in fact, a detriment to complainants. The alleged acquiescence, by silent or even open approval on the part of the agents who visited the mills where the timber was being sawed and knew from what lands it came and the distance thereof from the line of the San Juan Railway, could not operate as a relinquishment on the part of complainants of their right to demand damages therefor, if the taking of the timber was not within the privilege granted by the act. Pine River Logging Co. v. U. S., 186 U. S. 279, 290, 291, 22 Sup. Ct. 920, 46 L. Ed. 1164. The case does not fall within the rule that protects a licensee who has made expenditures upon another's estate for the latter's benefit. It is therefore not believed that the alleged acts of approval by complainants' agents can in any manner be made the basis of an estoppel.

By the litigated cases set up in the answer, in which these complainants were complainants and the defendant Denver and Rio Grande Railroad Company, or its predecessor railway company, were defendants, it is sought to bind the complainants to the definition of "adjacent," as used in the act of 1872, adopted in those cases, i. e., that public lands on which timber might be found suitable for construction and repair purposes were adjacent, within the meaning of said act, if they were within reasonable hauling distance by wagon from the defendant's line of railway. It is said that in those cases it was conclusively established that the public lands from which the timber in this suit is alleged to have been taken are within the definition of "adjacent," as there given,—there the public lands from which the timber was taken being much further from the defendant's line of railway than any of the lands from which timber appears to have been taken in this case. And so it is urged that that question is res adjudicata. Those were actions in personam. They were brought to recover damages for the value of complainants' personalty taken by the defendants. The locus from which the property was taken, was material, true,—but that was an incident to the issue. Those cases were not brought to fix a status. No such question was there presented for final adjudication,—not even as to the lands from which the timber was taken in those cases, much less the lands here involved. Those suits were in no sense proceedings in rem. [6] As I understand it the plea of res adjudicata as estoppel inter omnes must be made upon a judgment in a proceeding purely in rem.

Question 5 is therefore answered in the negative.

[7] As to question 6,—In 1887 the District Judge for this district construed the word "adjacent," as used in the act of June 8, 1872, as well as in the act of March 3, 1875, to include such lands from which the timber thereon might be transported to the line of the railway by ordinary wagon haul. United States v. D. & R. G. Ry. Co. (D. C.) 31 Fed. 886. However, that holding may be considered mere dictum, for the stipulated facts in that case admitted:

"4. That the lands from which the timber was cut were along and near and adjacent to the line of railway of said company." S. c. (C. C.) 34 Fed. 838; s. c. United States v. D. & R. G., 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975.

But the construction of the act in this particular was raised by the instructions of the trial court and passed on in the appellate court in Batcheldor v. U. S., 83 Fed. 986, 28 C. C. A. 246. In that case the court of appeals for this circuit approved the wagon haul rule. That court, speaking through Thayer, Judge, said:

"Probably no better or more reasonable test can be applied than that which was first suggested by Judge Hallett in U. S. v. Denver & R. G. Ry. Co. [D. C.] 31 Fed. 886, 889, namely, that timber should be regarded as adjacent to the right of way of a railroad, without reference to township or section lines, if it is within reasonable hauling distance by wagon. It is generally the case that timber suitable for railroad construction will not bear transportation by wagon from points remote from the established line of road, by reason of the expense incident to transporting it. If railroads, therefore, are limited in their right to take timber from the public domain to such timber standing on either side of their rights of way as they can reasonably afford to haul by wagon from the place where it is cut, it is probable that they will realize the full benefit of the privilege which congress intended to confer : :d that the privilege will not be abused."

And the same court, when the case now under consideration was before it on appeal from the order directing the issuance of the temporary writ, in considering this question said:

"While they insist that the timber was not taken from lands more than 12 miles distant from the right of way of the D. & R. G. Railroad Company, and that these lands were adjacent to that right of way, they concede that no definite limit to lands adjacent to a railroad under these acts of congress (acts of 1872 and 1875) has ever been fixed, and that the most rational and generally accepted definition of 'adjacent lands' under these acts is that originally given by the learned judge who granted this injunction—that they are lands upon which the timber is within reasonable hauling distance of a railroad by wagon. U. S. v. Denver & R. G. Ry. Co. [D. C.] 31 Fed. 886; Batcheldor v. U. S., 83 Fed. 986 [28 C. C. A. 246]; U. S. v. St. Anthony R. Co., 114 Fed. 722 [52 C. C. A. 354]."

These two opinions of the court of appeals for this circuit would, of course, be all-sufficient to bind this court to the wagon haul rule to be applied in determining what lands are "adjacent" to the railroad, but for United States v. St. Anthony R. R. Co., 192 U. S. 524, 24 Sup. Ct. 333, 48 L. Ed. 548, opinion in which was handed down by the supreme court after the cases in the court of appeals were decided. In that case the court said:

"The important question in this case is as to the meaning of the term 'adjacent' when used in the first section of the statute of 1875."

The supreme court then expressly disapproved the wagon haul rule, saying of it, at page 534 of 192 U. S., at page 336 of 24 Sup. Ct. (48 L. Ed. 548):

"We are not satisfied of the correctness of this construction or of its reasonableness. Lands might in this way be found adjacent which were 50 or 100 or more miles away, and which could not be regarded as adjacent within any meaning of that word heretofore given, and could only be said to be

adjacent in order to serve an exigency and to allow a railroad to procure timber gratuitously from the government. The purpose may, perhaps, be good, but the meaning cannot be stretched too far, even to accomplish a possible desirable end."

And again, page 540 of 192 U. S., page 338 of 24 Sup. Ct. (48 L. Ed. 548):

"We cannot take, for the reasons already stated, the fact of wagon-road transportation as a means of deciding whether the lands are or are not adjacent, for it seems to us that it may lead us far beyond any reasonable limit to the word."

The St. Anthony Case requires me to ignore the wagon haul rule; for on the point under consideration I can see no difference between the acts of 1872 and 1875. The latter act (18 Stat. 482) in that regard reads as follows:

"Also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad."

The St. Anthony Case does not give a fixed definition of "adjacent," —it did not intend to do so. But we find much in that opinion that is helpful in reaching a correct construction of that term in each case as it may arise. At page 536 of 192 U. S., at page 337 of 24 Sup. Ct. (48 L. Ed. 548), reference is made to Stone's Case, 64 Fed 667, 12 C. C. A. 451, thus: "The trial court had charged the jury that, under the act of 1875, the term 'adjacent lands' means lands in proximity, contiguous to, or near to the road," and of this definition of that term the supreme court then said:

"This court concurred with the circuit court of appeals in adjudging the charge to be a sound interpretation of the act." * * * Page 537 of 192 U. S., page 337 of 24 Sup. Ct. (48 L. Ed. 548). "We thus have the authority of this court that lands which are adjacent within the meaning of this act of 1875 must be lands in proximity, contiguous or near to the line of the road. While 'proximity' or 'nearness' to an object is somewhat uncertain as a measure of distance, yet the use of such words as a definition brings to the mind the idea that lands which are in fact far off, or distant, are not adjacent."

The court then refers to a letter of Mr. Vilas, Secretary of the Interior, to the Attorney General dated January 10th, 1889, in which the soundness of the wagon haul rule was doubted by the Secretary, and in which he expressed the view:

"That the use of the word 'adjacent' intended and meant the right to the public lands which were conveniently contiguous to the right of way and immediately accessible from it."

And gave it as his opinion that the correct construction of that act was that:

"Material may be taken from the tier of sections through which the right of way extends, as immediately adjoining the right of way, and perhaps an additional tier of sections on either side, as within the idea of 'adjacency.' "

The court then says of the Secretary's views:

"There is in our judgment much to be said in favor of this view of the statute. It falls in with the general system adopted by the United States

for the survey of its public lands. Those sections touching the line of the road would, of course, be included within the term, while those next to them might also be included, because, although not touching, they would be near to such line, and would, therefore, come within any definition of the term as being close or near to the line without being contiguous or actually touching it. It is not at all unreasonable to say that very probably congress had in mind this general system of division of the public lands, and that the word 'adjacent' would properly be interpreted with respect thereto. If the word 'adjoining' had been used instead of 'adjacent,' those sections touching the line of the road could be regarded as the adjoining lands, and when the word 'adjacent' instead of 'adjoining' is used, it might, not unnaturally, be said to include the next tier of sections away from the line of the road. We do not think that sections still further removed could, under this rule, be regarded as adjacent. The rule also gives certainty and definiteness to an otherwise somewhat doubtful expression, and, as the Secretary says, prevents the companies from ranging the public lands to secure material for the construction of their roads, and thus raising questions of legality in cutting in almost every case where the lands were beyond the sections described by the Secretary. This alone is an important consideration. If not bounded by section lines, the term 'adjacent' becomes of more or less uncertain meaning."

And then again, evidently referring to the instructions of the trial court in the Stone Case, the court, on page 541 of 192 U. S., on page 339 of 24 Sup. Ct. (48 L. Ed. 548) says:

"We are of opinion that the same ought to be said of these lands. They are not adjacent, for they are not near; they are not in close proximity to this strip of land 200 feet wide. This ordinary limitation of the meaning of the word should not be enlarged for the purpose of thereby embracing lands which otherwise would not come within any fair construction of the statute."

It is also worthy of note, in considering the meaning of the term "public lands adjacent thereto" in the act of 1872, that the right was not only given to take timber therefrom but also stone, earth, water, and other material required for the construction and repair of its railway and telegraph line. The right to take any or all of these materials must be confined to the same lands and it is evident that it was not intended by congress that the railway company could go further afield for the material that could be easily transported than it could for that which was more burdensome.

Some of the cases cited have, in construing what public lands are adjacent to the line of the road from which the right to take timber was granted by the act, called attention to the use of the same term, "adjacent" in the act, wherein, in connection with the grant of the right of way, the right is also given to "public lands adjacent thereto as may be needed for depot, shops and other buildings for railroad purposes and for yard room and sidetracks, not exceeding twenty acres at any one station;" and on this, by parity, it is said the term, in both instances, means close or near to.

The rule of construction given by Mr. Vilas was highly commended by the supreme court, and if it were not for what is further said in the St. Anthony Case, it would be followed here. Under that rule the railroad company would have a license to take timber from public lands covering a variable strip of a minimum width of three miles and a maximum width of six miles, lying in part on one side and in part on the other of its 200 foot right of way. The following rough

plat outlines such a strip. The road crosses three townships from east to west. I have included sections cornering with as well as those alongside sections touched by the right of way, as being within the Vilas rule:

The San Juan Railway crosses sections in its route in almost every conceivable way, and the above plat shows that where it follows a tier of sections the Vilas rule would give it the right to take timber for a distance of scarcely more than one mile from the line of the railway on one side and slightly less than two miles on the other side. The language of the supreme court, in further reference to the question of "adjacency," is as follows, page 539 of 192 U. S., page 338 of 24 Sup. Ct. (48 L. Ed. 548):

"Lands which are 20 miles off we cannot regard as adjacent to the line of a railroad within the meaning of this statute. *On the other hand, lands within 2 miles, we assume all would agree, are so adjacent.* At what point between these two extremes lands are on one side adjacent and on the other not adjacent, is a very difficult matter to decide. It is necessarily somewhat vague and uncertain, and we are not called upon to determine it in this case. All we have to do now is to declare that lands as far off as the lands in question are not adjacent lands, and it is unnecessary to say at what point on the intervening lands adjacency begins. It is very difficult to determine just where twilight ends and night begins, but it is easy enough to distinguish noon from midnight. If we say that 2 miles would be within the term and 20 would be beyond it, it might be asked why 19 miles would not also be beyond it, or 3 miles be within it, and these questions might puzzle one to answer. It can only be said that a distance of 20 miles is beyond it any way and 2 miles would be within it."

This is certainly a clear holding that lands within two miles of the line of road are adjacent lands within the meaning of the statute, and this is in obvious conflict with the Vilas rule. It is recognized that the term is of variable significance; there is no certain meaning which can be applied in all cases. I am of opinion that in this case the limit named by my predecessor, to wit, a strip three miles in width upon either side of the railroad right of way is a fair and reasonable interpretation of the statute,—the three mile strip to be measured at right angles with the direction of the lines of the boundary of said right of way. But when the court of appeals considered this case (124 Fed., 59 C. C. A., supra) it enlarged the order of Judge Hallett which restrained the railroad company from cutting from lands beyond a line three miles from its right of way upon either side, to six miles. That enlargement may have been solely precautionary. On the other hand, it may have been made, after full consideration, as an interpretation of the term "adjacent." And if the latter it may adhere to the six mile rule. I will therefore direct that the Master to be appointed, who shall report the facts, ascertain and report the amount of timber taken from the public lands in question under the three mile rule, and that he also report separately the timber taken by each of the defendants from the public lands in question under the six mile rule upon either side of the right of way—both within and without said limits.

My answer to question 6 therefore is, that lands more than three miles from the line of the right of way, measured at right angles therewith, are not "adjacent public lands" within the meaning of said act, and that lands within said three mile limit are adjacent lands from which the defendant railroad company and its agents, defendants, had the right to cut and take timber for construction and repair of its railroad and telegraph line.

[8] As to question 7,—The articles of incorporation of the railway company do not indicate whether any of its then contemplated lines of railway were to be narrow gauge or broad gauge roads. Nor does the act of June 8, 1872, give any suggestion in that regard. But, as I understand the facts, the railway company made all of its lines constructed prior to June 8, 1882, narrow gauge. It availed itself of the congressional grant for that purpose. At the time this suit was brought it had converted parts of some of these lines constructed prior to June 8, 1882, from narrow to broad gauge roads; and it is urged by complainants that any timber used for that purpose cannot be said to have been taken for repair, within the meaning of the act of June 8, 1872. It is believed that common knowledge teaches us that the conversion of a narrow to a broad gauge road works a radical change in the line so converted in every material sense. The bed on which the ties rest must be widened, the ties must be longer and heavier for a broad gauge than for a narrow gauge road, the rails placed upon the ties and their fastenings to the ties must be larger and heavier,—this must be so in order to sustain the greater burden of the heavier rolling stock to be thereafter passed over the road. For this purpose bridges must be reconstructed of heavier timbers, and likewise longer and heavier crossties placed thereon. This would necessarily be reconstruction and not repair of a previous structure. I have not had the benefit of the views of counsel on either side on this question, although it is one which the court of appeals said must be answered on final hearing. My own investigation has not discovered any authority directly to the point. There is some, however, that is helpful by way of analogy.

In Chicago v. Sheldon, 9 Wall. 50, 19 L. Ed. 594, it appeared that the charter contract required the street railway company to keep certain parts of the street in which its lines were constructed and operated "in good repair and condition." The question arose as to whether the street car company could be compelled to grade, pave, macadamize, fill or plank such parts, and it was held that it could not be compelled to do so,—that such improvements did not come within the category of repairs.

In Railway Co. v. Detroit, 34 Mich. 78, the same conclusion was reached.

In State ex rel. v. Street Ry. Co., 85 Mo. 263, 276, 277 (55 Am. Rep. 361) the same question was involved and the court said:

"The only condition or burden affixed to the privilege given by the ordinance to it to construct and operate its road was that it should keep and maintain the space between its rails and a space of two feet on either side of the line of its track and all street crossings along its line in good repair. The obligation to repair a street is one thing and the obligation to reconstruct a street is another and different thing. To repair a thing is to restore it to a sound state after decay, injury, dilapidation, or partial destruction. To reconstruct is to construct or build again. One who only assumes an obligation to repair a house could not be required to tear it down and rebuild it. Without torturing the language of section 4 of the ordinance of 1869, and turning it away from its ordinary meaning, we cannot construe it so as to impose on defendant an obligation to reconstruct a street, when in express terms it says the street shall be maintained and kept in good repair."

In Leek Imp. Commissioners v. The Justices, 20 Q. B. D. 794, it appears that a macadamized road was changed to a paved road with granite setts and the question arose as to whether or not this could be considered "maintenance" of the road within the sense of a legislative act so as to make the county liable for one-half the cost of such charge. The trial court held the county not liable; and on appeal Lord Esher, M. R., said:

"In this case we must, in the absence of any reason to the contrary, construe the section according to the ordinary meaning of the words as applied to the subject matter. In section 13 of the Highways and Locomotives (amendment) Act 1878, the legislature are, as it seems to me, referring to the 'road' not in the abstract sense of the word as indicating the way from one place to another, but in the concrete sense, as indicating the physical thing itself. Referring to the road in that sense, the legislature speaks of expenses incurred not in the making of the road but in the 'maintenance' of the road. The question is whether what has been done in this case comes within the term 'maintenance.' This road was a macadamized road. It might be, if, owing to increased traffic, it became necessary to use harder stone than had been previously to repair such a road, so as to provide a better macadamized road to meet the requirements of the traffic, the highway authority in so doing would only be maintaining the road. But everybody knows that a macadamized road and a paved road are quite different things; and what the highway authority did in this case was not to maintain the macadamized road, but to remove it and substitute another kind of road altogether; viz., a road paved with setts of granite. It appears to me that the decision of the learned judge was right and that this appeal should be dismissed."

In this conclusion Lindley and Bowen, L. JJ., concurred, saying "that 'maintenance' as used in section 13 is equivalent to 'repair.'" Bowen, L. J., added:

"By the term 'repairs' is included, I think, whatever is necessary to keep the road in a proper condition for traffic, having regard to the character and original manufacture of the road, but nothing further. * * * It seems to me that what the plaintiffs did was really making a new road of a different kind, not repairing the old one."

To hold otherwise in this case would be to duplicate the grant giving material for construction purposes,—construction of the original road as a narrow gauge line and then reconstruction of the road as a broad gauge line. We cannot so extend its meaning and purpose.

But, as already said, neither the articles of incorporation nor the congressional act gave any suggestion as to whether the parties contemplated the construction of a narrow or broad gauge road. This was optional with the grantee. It might construct either, and having constructed the one or the other the grant gave the railway company a continuing license to take timber to repair the lines so constructed. The railway company having constructed its lines as narrow gauge roads had the right to take timber to repair them so long as they were operated as narrow gauge roads. It undoubtedly had the right to reconstruct those lines, or such parts of them as it saw fit, and at such times as it might choose, into broad gauge roads; and having so reconstructed parts of its lines at its own expense, no reason is perceived why it did not have the right thereafter to avail itself of the privilege given under the grant to take timber to repair its broad gauge road. This right was given to the railway company under the

act in the first instance, and though it exercised its right to the timber for construction purposes in making its road narrow gauge, it is not believed that this would foreclose it against successfully claiming the right to take timber for repair purposes for its broad gauge road thereafter substituted for the narrow gauge.

My answer to question 7 is, that the company did not have the right to take timber from government lands adjacent to its right of way to make the narrow gauge railroad which was built prior to June 8th 1882, over into a broad gauge railroad, but that it did have the right to take such timber to repair its broad gauge railroad after such a change had been made.

[9] As to question 8,—In view of what is said in D. & R. G. Ry. Co. v. U. S. (C. C.) 34 Fed. 838, and s. c. 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975, this question is answered in the affirmative.

[10] As to question 9,—The railway company and its successor had the right, under the act of 1872, to go upon complainants' lands adjacent to its lines of railway and take therefrom such timber as was needed for construction and repair of its railroad. In doing so there would necessarily be parts of trees, when they were felled, not suitable for those purposes. Those parts remained the property of the complainants. The act only gave the right to take timber "required for the construction and repair of its railway and telegraph line." It did not have the right to take timber for any other purpose. It was not the purpose and intention of the grant, as disclosed by its terms, that the license should extend to the taking of complainants' timber and the manufacture thereof into various kinds of lumber and the disposal thereof on the market for the benefit of the grantee. It is insisted that the parts of trees not suitable to the uses contemplated by the congressional act would be mere waste and of no value to complainants, and that therefore the railroad company and its agents were entitled to utilize trees that proved, from latent causes, to be defective and the slabs or side cuts from logs that it did avail itself of, and thus to turn them into the markets for their benefit in the way of manufactured products which it made therefrom. The argument is not convincing. By what principle has A the right to decide that certain of B's property is useless to the latter and if not devoted to some purpose it will be lost, and thus A claim the right to take it for his own benefit? At the oral argument the question was illustrated by a grant conferring a license to go upon the lands of the grantor and take timber for the making and use of rails therefrom. The grantee would certainly not have the right to make the tops of trees felled for that purpose into cordwood and then dispose of the same for his own use and benefit. The illustration was then thought to be opposite, and it is so believed yet. I think the record shows that these defective logs and side cuts of logs were appropriated by the railroad company's agents, defendants here, and that it further appears that for such a privilege enjoyed by said agents the railroad company received some compensation in the way of reduced prices on the ties furnished it by said agents from the logs so taken.

The answer to question 9 therefore is, that as to all defective logs

and side cuts of other logs which were taken from "adjacent lands" and appropriated by said agents, said agents are liable to complainants therefor; and if the railroad company received a consideration from said agents on account of such appropriation, or with knowledge of what its agents were doing in that regard, acquiesced therein, it is jointly liable with its several agents. My knowledge of the record, gained from such examination of it as I have had time to make as well as from arguments of counsel, causes confidence in the belief that the railroad company both acquiesced in such appropriation and also received compensation therefor from said agents.

[11] As to question 19,—I think this question was put by the court of appeals on account of the showing by complainants on application for the temporary writ, as to the alleged practice of the railroad company in requiring from its agents all-heart ties. In considering that matter that court observed:

"The taking of trees of the United States to make ties of this character, so that all the remainder of the trees taken should become merchantable lumber of the railroad company or its agents, goes far to show a settled purpose to create an unnecessarily large excess of merchantable lumber, which was not to be used by the railroad company for the purposes specified in the acts of congress, and to negative the claim of the appellants that they were either carefully or economically exercising the privilege of the company."

The record contains copies of many tie orders given by the railroad company to its agents, in which there appears almost invariably the requirement that the ties should be all-heart. In addition to this the answers leave the impression that the orders, as given by the railroad company, were filled by the other defendants. But the answers in that regard should hardly be taken as a specific admission that the ties were all-heart. On taking the testimony much time was spent on this matter by the defendants; the complainants, on their part, relying on the written orders for the ties. The defendants' witnesses who had to do with receiving the orders from the railroad company, who directed the filling of said orders, and who actually conducted the operation in making the ties, testified without exception: That the all-heart tie requirement was never filled, that it was in all instances ignored and that in the very beginning of the giving of such orders the agent of the railroad company, who sent them in, was notified that such requirements would not be complied with; but that notwithstanding such notice, and similar notices thereafter, the orders continued to come with such requirement. Complainants' counsel did get from witness Hobbs, an employé of the railroad company, an apparent admission that one order for one hundred thousand all-heart yellow pine cross-ties was filled as given; but when the question which elicited the answer is considered I cannot regard it as having that effect. The question directed the attention of the witness to the order, which embodied the requirement of all-heart ties, and then asked:

"For what purpose those standard gauge ties were so ordered and why the same were consigned to Salida to the care of Superintendent Burns?"

The witness answered:

"I should say that these ties were furnished for the repairs of the standard gauge line on the first division of the Denver and Rio Grande Railroad."

And then this question and answer:

"Q. To the best of your knowledge how and where was these one hundred thousand all-heart, yellow pine cross-ties used under this order of February 16th, 1899? A. On the first division of the Denver and Rio Grande."

Each question, it will be noticed, embodied two matters, the most material parts of which did not refer to the character of the ties inquired about. Attention was also called to the fact that the testimony showed a very high percentage of the excess or side cut, ranging from about thirty per cent to fifty per cent of the entire log, and not lower than twenty per cent of the merchantable product in the logs. And there is dispute as to what a reasonable per cent of waste or side cut would be in an economical taking of timber by the railroad company for its purposes. But I think a fair view of the testimony on this point leads to the conclusion that the greater weight of the proof is with the defendants on the all-heart tie proposition. No other practices of consequence in getting out the timber for the railroad company, except the leaving of tops of trees on the ground, has been urged that need to be considered on this question.

Question 10 is therefore answered in the negative.

It is hoped that these views may be a sufficient guide under which the facts may be grouped in order to enter a proper decree. Counsel, on considering what is said above, may so aid the Court that a conclusion as to the necessary facts may be easily reached without the requirement of a critical and tedious examination of the record. If not it is urged that they file written consent to the appointment of a special master, to be selected by the Court if they cannot agree on one, whose duty it shall be to examine the entire record, take additional proof if necessary and make report of the facts needful for the entering of the decree. They are requested to respond to this suggestion on or before October first next. It is possible that correct conclusions on the facts may not be reached without first fixing the three mile limit on either side of the right of way within which lands are held to be adjacent to the line of the road and beyond which not adjacent; and an additional cruising of stumpage for the purpose of obtaining measurements in accord to such limits. Likewise as to the six mile limit. Counsel are better able to determine whether that be necessary than the Court. If it be found necessary the case would, on motion, be opened for that purpose.

The Master, it is believed, will find in what has already been said a guide for his inquiry and report. He will exclude from the timber to be charged against defendants any taken from the rights of way of the three defendant railroad companies and the timber taken by the two Pagosa railroad companies for construction purposes for their roads, or any timber taken by them, if not taken by them as agents of the Denver and Rio Grande Railroad Company. He will also exclude old stumpage, if any there be in the different es-

timates, left prior to the acts charged against any of the railroad company's agents in this case. It will be necessary for him to compute the amount of the excess or side cut from timber taken within said three mile limit, and within the six mile limit, separately, and the amount thereof separately converted by each agent of the railroad company to his or its use; with such excess or side cut so used by them and coming from within said three mile limit, they will be separately charged, but jointly with the railroad company. It will be necessary for him to compute the entire amount of timber taken by defendants from complainants' lands beyond the three mile limit, and beyond the six mile limit, separately, and separately the amount so taken by each defendant as agent of the railroad company, with which amount so separately taken by each agent beyond the three mile limit such agent will be charged jointly with the Denver and Rio Grande Railroad Company. He will report whether any of the timber taken within the three mile limit was used by the railroad company for the purpose of reconstructing its narrow guage road into a broad gauge road, and if any how much. Such timber so used. if any, will be charged against the railroad company.

The St. Anthony Case, 192 U. S., 24 Sup. Ct., 48 L. Ed., gives the measure of damage, I think, in each instance, i. e. whether it be for the excess or side cut from timber taken from complainants' lands within the three mile limit or for all of the timber beyond the three mile limit,—the value of the timber after it was cut at the place where it was cut. This value the Master will report.

So far as now advised it does not appear that either of the Pagosa railroad companies ought to be held for any of the timber, but that will be finally determined when the report of the Master comes in.

Some advancement by way of deposit in court should be made for the Master's services before he is appointed.